**COLORADO PERMANENTE MEDICAL GROUP, P.C.; David M. Guidot, M.D.; Joan Bodak; and Bonnie Ricke, Petitioners/Cross–Respondents,**

v.

**Susan M. EVANS, as an Individual; Susan M. Evans, as Guardian of Keith A. Evans, Melinda N. Evans and Rebecca D. Evans, Minors; and Susan M. Evans, as Representative of the Estate of Michael D. Evans, Deceased, Respondents/Cross–Petitioners.**

No. 95SC270.

Supreme Court of Colorado,
En Banc.

Nov. 12, 1996.

Rehearing Denied Dec. 9, 1996.

Pryor, Johnson, Montoya, Carney & Karr, P.C., Elizabeth C. Moran, Scott S. Nixon, Englewood, for Petitioners/Cross–Respondents.

FitzGerald Law Offices, Robert M. Fitz-Gerald, Lohf, Shaiman & Jacobs, P.C., John C. Steele, Denver, for Respondents/Cross–Petitioners.

Justice KOURLIS delivered the Opinion of the Court.

Susan Evans (Evans) brought a medical malpractice and wrongful death suit arising out of the death of her husband, Michael Evans (decedent), against Kaiser Foundation Health Plan (Kaiser),[1] Colorado Permanente Medical Group (CPMG),[2] Dr. David Guidot, and several Kaiser employees. The threshold issue presented to us by certiorari[3] is whether the arbitration clause in the Kaiser Permanente Group Medical and Hospital Service Agreement (Kaiser Agreement) was unenforceable under section 13–64–403, 6A C.R.S. (1996 Supp.), of the Health Care Availability Act (HCAA).[4] We hold, consistent with the court of appeals decision in *Evans v. Colorado Permanente Medical Group, P.C.*, 902 P.2d 867 (Colo.App.1995), that the HCAA does apply to the Kaiser Agreement; that the Kaiser Agreement did not comport with the requirements of section 13–64–403; and therefore that the arbitration

---

1. Kaiser is a health maintenance organization (HMO) organized under Part 4 of the Colorado Health Care Coverage Act, §§ 10–16–101 to –512, 4A C.R.S. (1994 & 1996 Supp.), and the federal HMO Act, 42 U.S.C. § 300e (1991). Generally, an HMO is an entity that both insures for and furnishes health care services, through contractual arrangements with selected hospitals and physicians. The recipients are a defined, voluntarily enrolled population, with whom the HMO also contracts, in exchange for periodic, prepaid, per capita premiums. *Chase v. Independent Practice Ass'n*, 31 Mass.App.Ct. 661, 583 N.E.2d 251, 252 n. 3 (1991).

2. CPMG is a physician group that contracts with Kaiser to provide medical services for Kaiser enrollees.

3. The issues reviewed on certiorari were framed as follows:
   1. Whether the court of appeals erred in holding the arbitration clause in Kaiser's HMO contract unenforceable with respect to medical malpractice claims, by determining that it did not meet the language and format requirements of § 13–64–403, 6A C.R.S. (1995 Supp.), when the clause complied with statutes and regulations enacted specifically for health maintenance organizations, which specifically address HMO dispute resolution procedures, including arbitration.
   2. Whether the court of appeals erred in applying § 13–21–111.6, 6A C.R.S. (1987), to require the defendant doctor, medical group, and nurses who provided services under the Kaiser contract to pay as damages the decedent's hospital expenses that had already been paid by Kaiser.
   3. Whether the court of appeals erred in holding that *General Electric Co. v. Niemet*, 866 P.2d 1361 (Colo.1994), in which the court held that the $250,000 cap on noneconomic damages in the general damages statute, § 13–21–102.5, 6A C.R.S. (1987), should be applied on a "per defendant" basis, did not apply to the $250,000 cap on noneconomic damages in the medical malpractice damages statute, § 13–64–302, 6A C.R.S. (1995 Supp.), thereby limiting the amount of noneconomic damages awarded to Evans in the jury's verdict to a single figure of $250,000.
   In citing to the statutes presented for review, the parties referred to the 1995 Cumulative Supplement. We note that there have been no changes to the pertinent 1995 statutes. Therefore, this opinion will cite to the 1996 Cumulative Supplement.

4. §§ 13–64–101 to –503, 6A C.R.S. (1996 Supp.).

clause was not enforceable.[5]

As to the other two issues on which we granted certiorari, we affirm the court of appeals decision that the medical malpractice damages statute, section 13–64–302, 6A C.R.S. (1996 Supp.), limits recovery for non-economic damages to $250,000 per patient; and, we reverse the court of appeals interpretation of the collateral source statute, section 13–21–111.6, 6A C.R.S. (1987), and remand with instructions to offset from the medical expenses award a portion of the amount that Kaiser has already paid as the decedent's health insurer.

The trial court initially ruled that the arbitration clause was not enforceable. After some discovery, the court then dismissed Kaiser from the suit on Kaiser's motion for summary judgment. The case proceeded to trial against CPMG, Dr. Guidot, and two Kaiser employees, Nurses Joan Bodak and Bonnie Ricke (collectively, the Providers). After a two-week trial, the jury rendered a verdict in favor of Evans in the amount of approximately $2,000,000 in damages. The trial court subsequently reduced the jury award pursuant to the statutory cap in section 13–64–302, 6A C.R.S. (1996 Supp.), and the collateral source rule in section 13–21–111.6, 6A C.R.S. (1987). The Providers and Evans both appealed various aspects of the judgment. The court of appeals modified the judgment by reinstating the jury award for medical expenses but otherwise affirmed. *Evans*, 902 P.2d at 877.

Although it was not a party to the appeal, Kaiser petitioned this court for certiorari. Evans cross-petitioned for certiorari and made a motion to strike Kaiser as an improper petitioner. We denied the motion to strike without prejudice to briefing and argument of the motion on substantive review. We now hold that Kaiser may not reenter the case for certiorari review purposes.[6]

I.

On Sunday, January 7, 1990, the decedent went to the Kaiser East Urgent Care Clinic because he was suffering from severe flu-like symptoms. At the clinic, Nurse Bodak interviewed him and checked his vital statistics. Nurse Ricke then showed him to an examination room where he was examined by Dr. Guidot, a physician employed by CPMG. Dr. Guidot advised the decedent that he had probably pulled a stomach muscle from vomiting and that he should go home, rest, and take Tylenol. Dr. Guidot told the decedent that if he continued to suffer from the symptoms, he should return to the clinic or call the Special Care Clinic at St. Joseph Hospital. The decedent followed Dr. Guidot's instructions.

At approximately 3:00 a.m. on Monday, January 8, 1990, the decedent suffered a massive heart attack. He was taken by ambulance to Humana Hospital in Aurora. In the hospital emergency room, a team of physicians determined that the decedent was in septic shock from a pervasive bacterial infection in his stomach. Surgeons moved quickly to remove his stomach, which had necrosed. The decedent was given large doses of intravenous antibiotics and was placed in intensive care. Despite all efforts, he died later that day. His condition was subsequently diagnosed as phlegmonous gastritis, a rare stomach inflammation caused by invasive Group A streptococcus, a fast-moving, highly toxic bacteria.

At the time of his death, the decedent was 35 years old, a husband and father of three minor children, and was employed as a computer programmer. Through his employment, the decedent had health care coverage for himself and his family with Kaiser pursuant to the Kaiser Agreement which he had executed in July 1989. The Kaiser Agreement contained a clause requiring the arbitration of any claims brought by the dece-

5. Pursuant to the petition and cross-petition for certiorari and our order granting certiorari, the question as to whether the HCAA is preempted by the Federal Arbitration Act, 9 U.S.C. § 2 (1994), is not before us and we express no opinion in that regard. *See* discussion at IIID, *infra* pp. 22–24.

6. We note that our order granting certiorari included Kaiser's name in the caption of the case. Having determined that Kaiser is not entitled to participate in this certiorari proceeding, we have corrected the caption of this opinion by deleting Kaiser's name.

dent or his family against Kaiser or any "health care providers" [7] rendering professional services under the agreement.[8]

Notwithstanding the arbitration clause, Evans filed suit in district court on her own behalf, as the guardian of her children, and as representative of the decedent's estate. In her complaint, Evans alleged that the Providers had negligently failed to diagnose and treat the decedent's condition. Evans further alleged that Kaiser had failed to maintain the decedent's medical records adequately and to communicate them to the defendant doctor and nurses; that Kaiser had maintained unreasonable policies and procedures for the provision of health care which led to the decedent's death; and that Kaiser had breached its contract with the decedent to provide him with health care services.

The Providers and Kaiser filed a motion to stay the district court proceeding and compel arbitration pursuant to the arbitration clause in the Kaiser Agreement. The trial court held that the arbitration clause was unenforceable because it did not comply with the format and language prescribed by section 13–64–403, 6A C.R.S. (1996 Supp.), of the HCAA.

The trial court later granted summary judgment for Kaiser on the negligence and contract claims and dismissed it from the suit. The case proceeded to trial against the Providers. After a two-week trial, the jury found for Evans, apportioning 50% fault to Dr. Guidot and CPMG, 25% to Nurse Bodak, 10% to Nurse Ricke, and 15% to the decedent. The trial court adjusted the damages award, including reducing the $1,002,176 award for noneconomic damages to $250,000 pursuant to the medical malpractice damages statute,[9] and reducing the award for past medical expenses by approximately $40,000, pursuant to the collateral source statute,[10] because Kaiser had previously paid those expenses as the decedent's health insurer.

On appeal, Evans claimed that the trial court had erred in granting summary judgment for Kaiser and disputed the reductions in the damages award made by the trial court. The Providers asserted in part that the trial court had erred in holding the arbitration clause unenforceable. The court of appeals affirmed the unenforceability of the arbitration clause under section 13–64–403 and the reduction of noneconomic damages under section 13–64–302, 6A C.R.S. (1996

---

7. Section 13–64–403(12)(a), 6A C.R.S. (1996 Supp.), defines "health care provider" as "any person licensed or certified by the state of Colorado to deliver health care and any clinic, health dispensary, or health facility licensed by the state of Colorado. The term includes any professional corporation or other professional entity comprised of such health care providers as permitted by the laws of this state." All uses of the term "health care provider" in this opinion refer to this statutory definition.

8. Section 8 of the Kaiser Agreement contains the arbitration clause. It reads, in pertinent part:

  8. ARBITRATION OF CLAIMS
  A. INITIATING A CLAIM. Any claim arising from alleged violation of a duty incident to this Agreement, irrespective of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted to binding arbitration if the claim is asserted:
  (1) By a Member, or by a Member's heir or personal representative, or by a person claiming that a duty to him or her arises from a Member's relationship with Health Plan, Hospitals or Medical Group incident to this Agreement ("Claimant"),
  (2) For any reason, including, but not limited to, death, mental disturbance, bodily injury or economic loss arising from the rendition or

failure to render services or the provision or failure to provide benefits under this Agreement or the consideration or defense of claims described in this Section,
  (3) For monetary damages exceeding the jurisdictional limit of the Small Claims Court, and
  (4) Against one or more of the following ("Respondent"):
    (a) Health Plan,
    (b) Hospitals,
    (c) Medical Group,
    (d) Any Physician, or
    (e) Any employee or agent of the foregoing.
  Furthermore, the "Application for Membership Enrollment" signed by the decedent also contained a sentence directly above the signature line which read as follows:
    I understand that as a part of my membership, the health plan service agreement requires that any claim for money damages asserted by a member's heirs or personal representatives must be submitted to binding arbitration instead of court trial.

9. § 13–64–302, 6A C.R.S. (1996 Supp.).

10. § 13–21–111.6, 6A C.R.S. (1987).

Supp.). It also affirmed the summary judgment for Kaiser. However, the court modified the damages award for past medical expenses concluding that the trial court had erred in its application of section 13–21–111.6, 6A C.R.S. (1987), and should not have reduced the award by the approximately $40,000 that Kaiser had previously paid. *Evans,* 902 P.2d at 875–76.

Although it was dismissed before trial and was not a party to the appeal, Kaiser petitioned this court for certiorari. Upon cross-petitioning for certiorari, Evans made a motion to strike Kaiser as an improper petitioner. This court denied the motion, but gave Evans leave to argue the issue on appeal. Evans has raised this issue in her brief and we now address it.

## II.

■ Evans argues that since Kaiser was neither a party at trial nor a party to the appeal in the court of appeals, Kaiser may not now interject itself into the case by petitioning for certiorari.

To the contrary, Kaiser contends that it became a party to the action in the court of appeals by virtue of Evans's cross-appeal of the order granting summary judgment and dismissing her claims against Kaiser. However, Kaiser did not file any documents with the court of appeals and was not included in the caption of the proceeding. Most critically, Kaiser did not file a petition for rehearing in the court of appeals.

Both the statute and the rule require the filing of a petition for rehearing as a condition precedent to a petition for certiorari. Section 13–4–108(1), 6A C.R.S. (1987), provides:

(1) Before application may be made for writ of certiorari, as provided in this section, application shall be made to the court of appeals for a rehearing as provided by supreme court rule.

Similarly, C.A.R. 52(b) directs that "[n]o writ of certiorari will issue unless a petition for

rehearing has been filed in the court of appeals."

■ We have previously held that a petition for certiorari will not be entertained by this court in the absence of the prerequisite petition for rehearing. *See Farmers Group, Inc. v. Williams,* 805 P.2d 419, 428–29 (Colo. 1991). In *Farmers Group,* we held that C.A.R. 52(b) requires both parties "to request a rehearing by the court of appeals on those aspects of the decision adverse to them." *Farmers Group,* 805 P.2d at 428–29. Neither party may rely upon the other party's filing. *Id. See also Wiggins v. People,* 199 Colo. 341, 343, 608 P.2d 348, 349 (1980); *Honey v. Ranchers & Farmers Livestock Auction Co.,* 191 Colo. 503, 504, 553 P.2d 799, 799–800 (1976).

The Providers filed a petition for rehearing in the court of appeals action and Evans filed a cross-petition. Kaiser did not file anything. Because Kaiser seeks certiorari on issues particular only to it, our holding in *Farmers Group* suggests that Kaiser's failure to request a rehearing by the court of appeals precludes it from filing a petition for certiorari in this court.

■ Moreover, in *Miller v. Clark,* 144 Colo. 431, 432, 356 P.2d 965, 966 (1960), we held that to maintain an appeal an individual or entity must "either be a party to the action or ... must be a person substantially aggrieved by the disposition of the case in the lower court." [11] As discussed above, Kaiser was not a party to the action in the trial court or in the court of appeals. Even if the *Miller* standards apply to certiorari petitions, we conclude that Kaiser was not substantially aggrieved by the disposition of the case in the court of appeals.

Kaiser argues that it was substantially aggrieved by the court of appeals disposition of the case for two reasons: (1) the court of appeals decision rendered Kaiser's standard arbitration agreement with thousands of HMO enrollees void; and (2) Kaiser accepted liability for the judgment against its two

---

11. The *Miller* case arose in the context of a direct appeal, thereby framing different concerns from those posed by certiorari review. An aggrieved entity seeking to enter the case on appeal has considerably more compelling arguments than does an aggrieved party that waits to step forward until the filing of a certiorari petition.

employees, Nurses Bodak and Ricke, which liability is impacted by the court of appeals determination of the issues.[12]

■ "The word *aggrieved* refers to ... the denial ... of some claim of right, either of property or of person, or the imposition ... of some burden or obligation." *Wilson v. Board of Regents,* 46 Colo. 100, 100, 102 P. 1088, 1089 (1909). *See Bush v. Winker,* 907 P.2d 79, 82 (Colo.1995) (general partner substantially aggrieved by default judgment against partnership because judgment created conditional liability for general partner if the partnership failed to satisfy the judgment); *Bye v. District Court,* 701 P.2d 56, 58 n. 10 (Colo.1985) (court-appointed attorneys substantially aggrieved by trial court's denial of requested attorney's fees); *Tower v. Tower,* 147 Colo. 480, 486, 364 P.2d 565, 568 (1961) (attorney substantially aggrieved by trial court's determination that it lacked jurisdiction to award fees to which attorney was entitled).

Kaiser has failed to demonstrate that it was substantially aggrieved by the court of appeals decision through the denial of a legal right or imposition of a burden. To begin with, Kaiser incorrectly asserts that the court of appeals decision has rendered its standard arbitration agreement with thousands of HMO enrollees void. The court of appeals held that the arbitration provision was void as to the health care providers covered by the Kaiser Agreement in malpractice actions brought directly against them. The court of appeals did not address the enforceability of the arbitration provision against Kaiser. Hence, the enforceability of the arbitration clause in certain actions against certain defendants has been impacted, but not in the sweeping manner Kaiser argues.

Next, Kaiser contends that its liability for judgments against the nurses constitutes an injury or burden. However, that liability arose from Kaiser's employment relationship with the nurses, not from a court order. Kaiser's own liability to its employees is not affected by the court of appeals construction of the Kaiser Agreement.

Therefore, although the trial court's judgment may have affected Kaiser's liability, the court of appeals decision did so only indirectly. For these reasons, there is not a sufficiently direct causal connection between the court of appeals decision and Kaiser's claimed injury to warrant the conclusion that Kaiser was directly and substantially aggrieved by the decision.

Kaiser did not file a petition for rehearing in the court of appeals. It further did not request a right to intervene as a party to the certiorari proceedings. Rather, it simply reconfigured the caption of the *Evans* case to indicate that it was a petitioner for certiorari review and joined this action without notice to opposing counsel, motion, or order of the court. In addition, Kaiser has failed to demonstrate that it was substantially aggrieved by the court of appeals decision. Thus, we conclude that Kaiser may not now participate as a party in this appeal by writ of certiorari.

## III.

We turn then to the central issue of whether sections 13–64–403(3) and (4), 6A C.R.S. (1996 Supp.), of the HCAA render the arbitration provision in the Kaiser Agreement unenforceable as against the Providers. Section 13–64–403(3) requires language that informs the patient of the intentions and understandings of the parties and discloses various substantive rights, including the patient's right to seek counsel and to rescind the arbitration agreement within 90 days of

12. In her complaint, Evans did not initially assert any claim that Kaiser was vicariously liable for the actions of its employees, Nurses Bodak and Ricke. Late in the trial, however, Evans made a Motion to Amend Complaint to Conform to Evidence and to Add Kaiser Foundation Health Plan of Colorado as a Defendant. In this motion, Evans did claim that Kaiser was vicari-

ously liable for the negligence of the two nurses. Defendants opposed the motion on the grounds that adding Kaiser as a defendant at that stage of the trial would be prejudicial. The trial court denied the motion to add Kaiser as a party, based in part upon the understanding that all parties believed that Kaiser was accepting re-

its execution.[13]   Section 13–64–403(4) requires that every arbitration agreement include a four paragraph, 10–point, bold-face warning to the patient that he or she is agreeing to arbitrate medical malpractice claims.[14]

### A.

The Providers do not dispute that the Kaiser Agreement did not comply with the requirements of the HCAA.  Rather, they assert that section 13–64–403 applies only to agreements entered into between patients and health care providers directly.  They claim that Kaiser, as an HMO, does not fall within the statutory definition of a health care provider, and, thus, the Kaiser Agreement is not covered by the HCAA.  The Providers further argue that the HCAA does not apply to HMOs because HMOs are governed exclusively by Part 4 of the Colorado Health Care Coverage Act (Coverage Act).[15]

The court of appeals did not resolve the question of whether Kaiser is a health care provider for purposes of the HCAA.  Rather, it concluded that the individuals and entity seeking refuge behind the Kaiser Agreement were indisputably health care providers and, thus, the HCAA applied.  *Evans,* 902 P.2d at 872.   The court resolved any ambiguity in the HCAA created by the absence of a specific reference to HMOs by relying upon the language of subsection (2) of section 13–64–403.  *Evans,* 902 P.2d at 872.   The court inferred from that subsection that the statute

sponsibility for any judgments entered against the nurses.

13.   Section 13–64–403(3), 6A C.R.S. (1996 Supp.), provides that:

Any such agreement shall have the following statement set forth as part of the agreement: "It is understood that any claim of medical malpractice, including any claim that medical services were unnecessary or unauthorized or were improperly, negligently, or incompetently rendered or omitted, will be determined by submission to binding arbitration in accordance with the provisions of the "Uniform Arbitration Act of 1975", part 2 of article 22 of title 13, Colorado Revised Statutes, and not by lawsuit or resort to court process except as Colorado law provides for judicial review of arbitration proceedings.  The patient has the right to seek legal counsel concerning this agreement, and has the right to rescind this agreement by written notice to the physician within ninety days after the agreement has been signed and executed by both parties unless said agreement was signed in contemplation of the patient being hospitalized, in which case the agreement may be rescinded by written notice to the physician within ninety days after release or discharge from the hospital or other health care institution.  Both parties to this agreement by entering into it, have agreed to the use of binding arbitration in lieu of having any such dispute decided in a court of law before a jury."

14.   Section 13–64–403(4), 6A C.R.S. (1996 Supp.), provides that:

Immediately preceding the signature lines for such an agreement, the following notice shall be printed in at least ten-point, bold-faced type:

NOTE: BY SIGNING THIS AGREEMENT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL BINDING ARBITRATION RATHER THAN BY JURY OR COURT TRIAL.

YOU HAVE THE RIGHT TO SEEK LEGAL COUNSEL AND YOU HAVE THE RIGHT TO RESCIND THIS AGREEMENT WITHIN NINETY DAYS FROM THE DATE OF SIGNATURE BY BOTH PARTIES UNLESS THE AGREEMENT WAS SIGNED IN CONTEMPLATION OF HOSPITALIZATION IN WHICH CASE YOU HAVE NINETY DAYS AFTER DISCHARGE OR RELEASE FROM THE HOSPITAL TO RESCIND THE AGREEMENT.

NO HEALTH CARE PROVIDER SHALL WITHHOLD THE PROVISION OF EMERGENCY MEDICAL SERVICES TO ANY PERSON BECAUSE OF THAT PERSON'S FAILURE OR REFUSAL TO SIGN AN AGREEMENT CONTAINING A PROVISION FOR BINDING ARBITRATION OF ANY DISPUTE ARISING AS TO PROFESSIONAL NEGLIGENCE OF THE PROVIDER.

NO HEALTH CARE PROVIDER SHALL REFUSE TO PROVIDE MEDICAL CARE SERVICES TO ANY PATIENT SOLELY BECAUSE SUCH PATIENT REFUSED TO SIGN SUCH AN AGREEMENT OR EXERCISED THE NINETY-DAY RIGHT OF RESCISSION.

15.   §§ 10–16–101 to –512, 4A C.R.S. (1994 & 1996 Supp.).   When enacted, the Coverage Act was a nonsubstantive revision and reorganization of the Colorado health insurance statutes.   Part 4 of the Coverage Act, §§ 10–16–401 to –428, 4A C.R.S. (1994), deals with HMOs.   Originally, this HMO legislation was known as the "Colorado Health Maintenance Organization Act," §§ 10–17–101 to –140, 4A C.R.S. (1987), before it was repealed and reenacted as Part 4 of the Coverage Act in 1992.   Act approved Apr. 29, 1992, ch. 208, sec. 1, 1992 Colo.Sess.Laws 1729.

applies to *any agreement* providing for the arbitration of medical malpractice claims, irrespective of the capacities of the parties to the agreement. *Id.* It thus rejected the argument that the statute did not apply because Kaiser was not a health care provider. *Id.* Moreover, the court found no conflict between the HMO-specific legislation in the Coverage Act and the requirements imposed by the HCAA. *Id.* The court concluded that the statute applied to the Kaiser Agreement since the agreement provided for the arbitration of medical malpractice claims. *Id.* Because the arbitration provision did not comply with section 13–64–403, that provision was deemed void and the Providers were not permitted to compel arbitration. *Id.* at 873. We agree with the court of appeals.

## B.

Since Kaiser is not a party to this proceeding, and since there are no surviving claims against Kaiser, we need not reach the issue of whether Kaiser is itself a health care provider. Rather, our task is to evaluate whether the Kaiser Agreement propounded by the Providers in this case, is subject to the requirements of the HCAA. The Kaiser Agreement requires arbitration of all disputes arising between the decedent and Kaiser, its employees, and contracting physicians. The Providers in this case were employees and contracting physicians of Kaiser. It is the Providers who here seek to enforce the arbitration provisions. Kaiser is not a party to this case, and there are no direct claims against Kaiser that are at issue.

■ Hence, we must determine whether the Providers may enforce the arbitration provision of the Kaiser Agreement even though it is undisputed that the provision does not comply with section 13–64–403. On

that issue we hold that the Kaiser Agreement must comply with the HCAA requirements in order to be enforceable by the Providers.

■ A court's primary purpose in interpreting a statute is to ascertain and give effect to the intent of the legislature. *Smith v. Zufelt,* 880 P.2d 1178, 1183 (Colo.1994). To effectuate the legislative intent, we first look to the statutory language and give words and phrases their plain and ordinary meaning. *Id.* Part 4 of the HCAA, entitled "Procedures and Evidence in Medical Malpractice Actions," contains section 13–64–403. This section governs the form and substance of arbitration agreements used in the health care context. Section 13–64–403(2), 6A C.R.S. (1996 Supp.), states that:

> Any agreement for the provision of medical services which contains a provision for binding arbitration of any dispute as to professional negligence of a health care provider that conforms to the provisions of this section shall not be deemed contrary to the public policy of this state. . . .

In addition, the final portion of Part 4 of the HCAA provides that "[t]his part 4 shall take effect July 1, 1988, and shall apply to acts or omissions occurring on or after said date and shall apply to agreements for medical services containing a binding arbitration provision on or after said date." § 13–64–404, 6A C.R.S. (1996 Supp.).

It is undisputed that the Kaiser Agreement is for the provision of medical services and that it provides for the binding arbitration of professional negligence claims against health care providers. If the Providers had entered into the Kaiser Agreement directly with the decedent, the HCAA would clearly apply. Nothing in the statute suggests that the identity of the contracting party requires a different result.[16] Thus, despite the fact

---

16. The basis of the Providers' argument that the HCAA only applies to agreements between a health care provider and a patient is the following language: "It is the intent of the general assembly that an arbitration agreement be a voluntary agreement between a patient and a health care provider. . . ." § 13–64–403(1), 6A C.R.S. (1996 Supp.). The Providers argue that this criterion would only be satisfied if an arbitration agreement were actually signed by a health care

provider. Such a narrow application would enable health care providers to avoid the requirements of the statute simply by having non-health care providers sign arbitration agreements on their behalf. We cannot support an application that would so easily frustrate the purposes of the HCAA.

A complete reading of § 13–64–403(1) reveals that the quoted language relates to the requirement that an arbitration agreement be entered

that the decedent contracted with Kaiser and not directly with the individual health care providers who were charged with malpractice in this case, section 13–64–403, 6A C.R.S. (1996 Supp.), applies to the Kaiser Agreement.[17]

## C.

■ The Providers rely upon the existence of the Coverage Act as a shield for HMOs against the HCAA. They maintain that HMOs are governed exclusively by the Coverage Act and are not required to comply with the HCAA.

Part 4 of the Coverage Act governs the organization and activities of HMOs in Colorado. The statute does not set out any specific requirements regarding arbitration agreements between HMOs and enrollees; it does, however, mandate that each HMO establish and maintain a complaint system approved by the Commissioner of Insurance to provide reasonable procedures for the resolution of written complaints initiated by enrollees concerning health care services. § 10–16–409, 4A C.R.S. (1994). The commissioner, in turn, has promulgated a regulation that concerns arbitration agreements used by HMOs. This regulation, Rule VIII(D)(5), 3 C.C.R. 702–4–7–2 (1992), provides:

If an enrollee's complaints and grievances may be resolved through a specified arbitration agreement, the enrollee shall be advised in writing of his rights and duties under the agreement at the time the complaint is registered. Any such agreement must be accompanied by a statement setting forth in writing the terms and conditions of binding arbitration. Any health maintenance organization that makes such binding arbitration a condition of enrollment must fully disclose this requirement to its enrollees in the contract and evidence of coverage.

Hence, dispute resolution procedures and arbitration agreements used by HMOs are controlled to some degree by the statutes and regulations that specifically apply to HMOs.

While the Coverage Act provides that HMOs act under the general supervision of the Commissioner of Insurance, there is nothing in the Coverage Act that would exempt HMOs from the HCAA when the HMOs enter into arbitration agreements on behalf of their employees and the other health care providers with whom they contract. Section 10–16–421, 4A C.R.S. (1994), of the Coverage Act sets forth the statutory construction and relationship to other laws of Part 4 of the Coverage Act.[18] It provides

into voluntarily. There is no evidence that subsection (1) is intended to limit the application of the statute. Rather, the scope of the statute is expressly addressed in § 13–64–403(2) and § 13–64–404.

17. We note that this interpretation of the HCAA is consistent with the legislative history. The HCAA was originally introduced as Senate Bill 143 in the Senate Business Affairs and Labor Committee by Senator Ted Strickland. During the Senate floor debate on Senate Bill 143, Senator Strickland expressed his concern for "the patients in this country and in this state," and stated that one purpose of the bill was to provide these patients with an option to settle their claims in a timely fashion through arbitration. Senate Floor Debate on S.B. 143, 56th Gen. Assembly, 2d Sess., Feb. 25, 1988. However, Senator Strickland and other legislators, especially Senators Donald A. Sandoval and Brian McCauley, were cognizant of the danger that patients might waive their rights to sue in court because of duress or lack of information. *Id.* *See also* Hearings on S.B. 143 before the Senate Business Affairs and Labor Committee, Feb. 15, 1988. To protect against this danger, the Senate specifically included safeguards in § 13–64–403,

such as the patient's right of rescission and the requirement of precise language informing the patient of his or her rights. Because these safeguards were intended for the protection of all patients, it is clear that the legislature was focusing on any agreement concerning arbitration of medical malpractice claims without regard to the capacities of the parties to that agreement.

18. Section 10–16–421, 4A C.R.S. (1994), provides in pertinent part:
(1) Except for sections 10–1–102, 10–1–121, 10–1–122, 10–3–118, 10–3–128 and parts 4 to 7 of article 3 of this title, and as otherwise provided in this article, the provisions of the insurance law and provisions of nonprofit hospital, medical-surgical, and health service corporation laws, shall not be applicable to any health maintenance organization granted a certificate of authority under this part 4.
. . . .
(3) Any health maintenance organization authorized under part 1 of this article and this part 4 shall not be deemed to be practicing medicine and shall be exempt from the provisions of laws relating to the practice of medicine.

that certain categories of statutes are inapplicable to HMOs. The HCAA, however, is a title 13 statute,[19] and does not fall into a category designated by section 10–16–421. Thus, section 10–16–421 does not exempt HMOs from the application of the HCAA.

Furthermore, there is no conflict between the legislative mandates of the Coverage Act and the HCAA. Under the Coverage Act, dispute resolution procedures must meet the commissioner's approval and arbitration agreements must conform to the requirements set forth in Rule VIII(D)(5), 3 C.C.R. 702–4–7–2 (1992). Under the HCAA, an agreement requiring arbitration of claims against health care providers must contain the language required by section 13–64–403(3) and (4), 6A C.R.S. (1996 Supp.), and must comport with the other measures in the section designed to protect patients. The requirements of the two acts with regard to arbitration agreements are not contradictory and we conclude that HMOs must comply with both.[20]

### D.

■ Next, the Providers assert that section 13–64–403 is preempted by the Federal Arbitration Act (FAA), 9 U.S.C. § 2 (1994). They admit, however, that they failed to make this argument at trial or on appeal in the court of appeals. In *Lambdin v. District Court*, 903 P.2d 1126, 1132 (Colo.1995), we declined to consider the defendant's argument that a state statute was preempted by the FAA because the defendant had failed to raise the issue at trial. Consistent with our decision in *Lambdin*, we decline to consider the Providers' argument here.

Our judicial system depends upon the orderly presentation and preservation of issues. At the trial court level, parties must be given an opportunity to present evidence and argue the factual as well as legal ramifications of that evidence. At the court of appeals level, the parties must identify the issues that are critical to the case and invite analysis and resolution of those issues. Proceeding otherwise risks substantial injustice.

This case is no exception. Neither the Providers nor Kaiser[21] raised the preemption argument in the trial court, and they did not raise it on appeal to the court of appeals. There is no reason why they could not have done so. Although two important United States Supreme Court cases[22] post-date the trial court proceedings, the question of federal preemption of state laws regulating arbitration clauses was framed as early as 1984 in *Southland Corp. v. Keating*, 465 U.S. 1, 10–11, 104 S.Ct. 852, 858–59, 79 L.Ed.2d 1 (1984). The issue is not newly minted.

The danger of permitting additional issues to be raised at this late stage in the proceedings is exemplified by this case. First, the issue should have been heard by the trial court in connection with the initial request to refer the matter to arbitration. The question of whether the Kaiser Agreement falls within the scope of the FAA may involve

---

**19.** Title 13 of the Colorado Revised Statutes contains the law of courts and court procedure in Colorado.

**20.** The Providers argue that the requirements of § 13–64–403, 6A C.R.S. (1996 Supp.), are unworkable when applied to health care delivery by an HMO. This argument assumes that the statute requires enrollees to sign an arbitration agreement every time they have a new illness, see a new physician, or visit a different clinic. Evans argues that, in order to comply with § 13–64–403, Kaiser need only add the requisite statement of rights and notice to its standard service agreement and obtain an enrollee's signature once. We are inclined to agree with Evans. The issue is not squarely before us, but, in concept, we find no reason why a new agreement would be required for each specific medical service.

Rather, the statute provides that a complying arbitration agreement would "govern all subsequent provision of medical services for which the agreement was signed." § 13–64–403(5), 6A C.R.S. (1996 Supp.). Hence, an initial agreement executed between an HMO and an enrollee, with one rescission period, would appear to be sufficient for all subsequent medical services.

**21.** Kaiser was still a party to the case when the enforceability of the arbitration provision was decided by the trial court.

**22.** *See Doctor's Assocs., Inc. v. Casarotto*, —— U.S. ——, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *Allied–Bruce Terminix Cos. v. Dobson*, —— U.S. ——, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

factual determinations.[23] Second, rebriefing and argument of the issue before this court would further delay the issuance of an opinion when the case has already been pending for over five years.

We are charged with resolving the issues that are properly before us. The applicability of the FAA was not presented for findings and rulings at the trial court level; it was not argued to the court of appeals and it was not framed in the grant of certiorari before this court. Although the issue is clearly an important one, we should not strain the confines of this case and reach out to decide it.

## IV.

We turn now to the other two issues raised by the grant of certiorari. The court of appeals affirmed the trial court's judgment that section 13–64–302, 6A C.R.S. (1996 Supp.), the medical malpractice damages limitation provision of the HCAA, limited Evans's total recovery for noneconomic damages to $250,000. *Evans*, 902 P.2d at 875. Evans argues that the court of appeals erred in applying the statutory cap in section 13–64–302 on a "per patient" basis rather than on a "per defendant" basis. She contends that this result is in conflict with this court's decision in *General Electric Co. v. Niemet*, 866 P.2d 1361 (Colo.1994).

In *Niemet*, we interpreted the general damages statute, section 13–21–102.5, 6A C.R.S. (1987 & 1993 Supp.), which provides that:

> In any civil action in which damages for noneconomic loss or injury may be awarded, the total of such damages shall not exceed the sum of two hundred fifty thousand dollars, unless the court finds justification by clear and convincing evidence therefor. In no case shall the amount of such damages exceed five hundred thousand dollars.

§ 13–21–102.5(3)(a), 6A C.R.S. (1987).

We found this statute ambiguous on its face with respect to "whether the cap is meant to limit the plaintiff's total award or the liability of an individual defendant." *Niemet*, 866 P.2d at 1364. In reviewing the legislative history of section 13–21–102.5, we noted that the goal of the general assembly in enacting the cap was to increase the affordability of insurance by improving the predictability of risks faced by insurance companies. *Id.* at 1365. We also determined that it was the legislature's intention to balance "the concern over insurance affordability and predictability with concern for fairness to seriously injured people." *Id.* We concluded that "[t]he intent was to cap the amount of noneconomic damages paid by individual defendants, in order to increase predictability for insurance companies, while at the same time not restricting the recovery of noneconomic damages by seriously injured persons more than was necessary...." *Id.* at 1365–66. Hence, we held that the $250,000 cap on noneconomic damages in section 13–21–102.5 limits a plaintiff's recovery for noneconomic damages to $250,000 from *each* defendant. *Id.* at 1367–68.

Evans argues that the reasoning in *Niemet* applies to the $250,000 cap on noneconomic damages in the medical malpractice damages statute, section 13–64–302, 6A C.R.S. (1996 Supp.), and that she should thus be allowed to recover a maximum of $250,000 in noneconomic damages from each defendant in this case. We disagree.

The medical malpractice damages statute provides in relevant part:

> The total amount recoverable for all damages for a course of care for all defendants in any civil action for damages in tort brought against a health care professional ..., shall not exceed one million dollars, present value per patient, including any derivative claim by any other claimant, of which not more than two hundred fifty thousand dollars, present value per patient, including any derivative claim by any other claimant, shall be attributable to noneconomic loss or injury ...; except that if, upon good cause shown [the court

**23.** We note that the arbitration agreement in *Doctor's Associates* was found by the trial court to fall within the scope of the FAA. *Doctor's Assocs.,* —— U.S. at ——, 116 S.Ct. at 1654. The Supreme Court did not review those factual findings because they were not in dispute by the time the case reached that level.

determines that the cap is unfair in light of the total amount of lost earnings and medical expenses added to other damages, in which case the court may then award damages in excess of the $1,000,000 cap.]

§ 13–64–302, 6A C.R.S. (1996 Supp.).

Unlike the general damages statute, section 13–64–302 is not ambiguous on its face. While Evans may be correct in her assertion that section 13–64–302 was passed in the same tort reform spirit as the general damages statute and contains a similar cap on noneconomic damages, this in no way diminishes the fact that the language of the two statutes is significantly different. Section 13–64–302 unequivocally states that the "total amount recoverable for a course of care for all defendants" attributable to noneconomic damages shall not exceed $250,000, "present value per patient."

In this case, there was one patient for whom there was one "course of care." The plain language of the statute limits Evans to one total recovery of $250,000 in noneconomic damages. Accordingly, we affirm the court of appeals and hold that the cap on noneconomic damages in section 13–64–302 is applied on a "per patient" basis.

## V.

Lastly, the Providers claim that the court of appeals erred in reversing the trial court's reduction of the award against them for past medical expenses that Kaiser had already paid as the decedent's health insurer. The trial court had determined that Kaiser, by virtue of providing the decedent's health insurance, had paid approximately $40,000 of the $46,000 in medical expenses incurred and awarded. It deducted this amount from Evans's award for past medical expenses, reasoning that Evans would otherwise receive a double recovery. The court of appeals reversed, holding that Kaiser's payment of the decedent's medical expenses fell within the "contract exception" of section 13–21–111.6, 6A C.R.S. (1987), and thus should not have been deducted from the jury award. *Evans*, 902 P.2d at 876. We reverse the court of appeals, and remand for modification of the judgment consistent with this opinion.

## A.

At common law, the collateral source rule provided that "compensation or indemnity received by an injured party from a collateral source, wholly independent of the wrongdoer and to which he has not contributed, will not diminish the damages otherwise recoverable from the wrongdoer." *Kistler v. Halsey*, 173 Colo. 540, 545, 481 P.2d 722, 724 (1971). "The purpose of the collateral source rule was to prevent the defendant from receiving credit for such compensation and thereby reduce the amount payable as damages to the injured party." *Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1074 (Colo. 1992). "The rule evolved around the common sense notion that a tortfeasor ought not be excused because the victim was compensated by another source, often insurance." *Quinones v. Pennsylvania Gen. Ins. Co.*, 804 F.2d 1167, 1171 (10th Cir.1986).

Section 13–21–111.6 codifies the common law collateral source rule, and modifies it to limit the circumstances under which a plaintiff may receive double compensation for an injury. The statute requires reduction of tort damages awards by the amount a plaintiff "has been or will be wholly or partially indemnified or compensated for his loss by any other person, corporation, insurance company, or fund in relation to the injury, damage, or death sustained...." § 13–21–111.6, 6A C.R.S. (1987). The statute, however, contains a "contract exception" provision which states that a "verdict shall *not be reduced* by the amount by which [the plaintiff] ... has been or will be wholly or partially indemnified or compensated *by a benefit paid as a result of a contract entered into and paid for by or on behalf of [the plaintiff]*." *Id.* (emphasis added).

The Providers contend that the award for past medical expenses should be reduced by the amount Kaiser previously paid as the decedent's insurer. They argue that the contract exception does not apply in this case because Kaiser is itself liable for the judgment against Nurses Bodak and Ricke, as explained in footnote 12, *supra*. The Providers assert that the rationale for the contract exception vanishes when the payor under the

contract is the same entity as the one responsible for the ultimate judgment, because the payor gains no windfall by application of the collateral source rule. Rather, the payor pays the sums once, and the plaintiff receives them once. In support of their position, the Providers cite three Tenth Circuit cases: *Mays v. United States,* 806 F.2d 976 (10th Cir.1986); *Quinones v. Pennsylvania General Ins. Co.,* 804 F.2d 1167 (10th Cir.1986); and *Steckler v. United States,* 549 F.2d 1372 (10th Cir.1977).

In *Steckler,* the plaintiff filed a claim against the federal government under the Federal Tort Claims Act alleging medical malpractice on the part of the Veterans Administration Hospital in Denver. The circuit court of appeals held that the federally funded portion of the plaintiff's Social Security benefits was not a collateral source payment and should therefore be offset against the plaintiff's judgment against the United States. *Steckler,* 549 F.2d at 1379. In *Mays,* the court similarly held that the plaintiff's tort verdict against the United States should be reduced by the dollar amount of benefits the plaintiff had already received from the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). Basing its conclusion on *Steckler,* the court reasoned that the CHAMPUS benefits did not come from a source collateral to the United States because the CHAMPUS fund was financed solely by the government, with no contribution from the plaintiff. *Mays,* 806 F.2d at 977–78. Finally, in *Quinones,* the court examined a situation in which the plaintiff, injured by an uninsured motorist, filed suit against his own insurance carrier seeking damages for injuries suffered in the acci-

dent, including medical expenses already paid by the insurer under the medical pay provisions of the insurance policy. The court held that the plaintiff could not recover those expenses which the insurer had already paid under the policy because the insurer was both a defendant and a collateral source. *Quinones,* 804 F.2d at 1171–72.[24]

## B.

■ Kaiser was the medical insurer for the decedent and thus paid the $40,000 in medical expenses at the time those expenses were incurred. Kaiser also is liable for the judgment against the nurses consisting of 35% of the total judgment. The question, therefore, is the extent to which Kaiser's dual role entitles the Providers to an offset for medical expenses previously paid. We disagree with the Providers' assertion that section 13–21–111.6 requires that the award for medical expenses be offset by the entire $40,000 that Kaiser paid as the decedent's health insurer. Rather, the statute requires offset only of the portion of the medical expenses award for which Kaiser is liable on behalf of the defendant nurses. The jury determined that Nurse Bodak was 25% at fault and that Nurse Ricke was 10% at fault. Kaiser is therefore liable for a cumulative 35% of the judgment and, accordingly, 35% of the medical expenses award. As the decedent's health insurer, Kaiser has paid $40,000 of the $46,000 in medical expenses that the jury awarded to Evans. Thus, pursuant to section 13–21–111.6, 35% of the $40,000 paid by Kaiser is properly offset against the $46,000 award. The portion of the medical ex-

24. The Providers also argue that to deny offset in this case places Kaiser in the nonsensical position of having a subrogated claim against itself since it has accepted liability for judgments against the nurses in this case. Section 13–64–402, 6A C.R.S. (1996 Supp.), addresses subrogation rights in medical malpractice suits. Section 13–64–402(1) requires a plaintiff in a medical malpractice action to send written notice of the action to third party payors of medical expenses. After receiving notice, a third party payor must then file notice with the court asserting its right of subrogation in order to recover the cost of the medical expenses out of any judgment awarded. § 13–64–402(2), 6A C.R.S. (1996 Supp.). Therefore, the Providers are hypothetically correct that

the operation of § 13–64–402 would require Kaiser to engage in an unnecessary and circular payment of money because it would first have to pay the judgment against the nurses and then, pursuant to the statute, recoup its money for the medical expenses out of that judgment. In this case, however, Evans did not notify Kaiser of the suit under § 13–64–402(1) and Kaiser did not file with the court under § 13–64–402(2), presumably because Kaiser was originally named as a defendant. Nevertheless, because Kaiser's subrogation rights were not determined at trial, and because we have determined that the portion of the medical expenses award attributed to the nurses must be offset, we decline to decide any issue as to Kaiser's potential subrogation rights.

penses award attributed to Dr. Guidot and CPMG, however, is not offset because it falls within the contract exception of the statute.

This court comprehensively analyzed section 13–21–111.6 and its contract exception in *Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070 (Colo.1992). In that case, the defendant moved to have an award for tort damages reduced by the amount of disability benefits that the plaintiff had received through the plaintiff's employer's pension fund. We determined that the contract from which the benefits derived was entered into and paid for by both the plaintiff and his employer on the plaintiff's behalf. *Id.* at 1079. We thus held that the award should not be reduced because the disability benefits fell within the contract exception of section 13–21–111.6. *Van Waters*, 840 P.2d at 1079.

The present case, however, is easily distinguished from *Van Waters*. In *Van Waters*, the defendant was not paying the disability benefits. If the award had been offset by the amount of those benefits, the defendant would have been excused from paying a portion of the award: a result that would be contrary to the policy of the collateral source statute. *Id.* at 1078. Here, Kaiser has already paid the full medical expenses as the decedent's insurer. If section 13–21–111.6 were to apply, Kaiser would be entitled to an offset against any portion of the medical expenses for which judgment would enter against the nurses. The court of appeals application of the contract exception to deny any offset of the medical expenses that Kaiser has paid results in a double recovery for Evans. This result is also contrary to the goal of section 13–21–111.6, which is to limit double recovery. *Id.* "The [common law] collateral source rule was not applicable in situations in which a plaintiff's compensation was attributable to the defendant." *Id.* at 1074. There is no indication that section 13–21–111.6 changes this intent.

Alternatively, if the medical expenses award were to be offset by the entire amount that Kaiser previously paid, then Dr. Guidot and CPMG would be excused from having to pay the portion of that amount of the award for which they are liable. The portion of the medical expenses award for which Dr. Guidot and CPMG are liable falls within the contract exception of section 13–21–111.6 and thus should not be offset because Kaiser is not liable for that portion.

Our conclusion is consistent with the Tenth Circuit's opinion in *Quinones*, where that court stated that "we are not 'excusing' [the insurer] from liability when we forego the collateral source rule in this case; it has completely reimbursed [the plaintiff's] past medical expenses. Just as the rule's goal is not to reimburse plaintiffs twice, though often times that is its effect, its goal is not to charge defendants twice, either." *Quinones*, 804 F.2d at 1172. In this case, Kaiser originally paid a portion of the medical expenses and therefore should not be charged twice. Dr. Guidot and CPMG, however, must be required by the judgment to reimburse the share of the medical expenses for which they were found liable.[25]

## VI.

The public policy behind the language requirements for arbitration agreements in section 13–64–403, 6A C.R.S. (1996 Supp.), of the HCAA is to protect patients from unknowingly and involuntarily waiving their rights to sue in court. It is clear that this policy is intended to apply to all agreements that provide for the arbitration of medical malpractice claims against health care providers. Thus, the Kaiser Agreement must comply with the requirements of section 13–64–403 even though Kaiser, the entity which negotiated the agreement on behalf of the Providers, operates as an HMO under a separate statutory and regulatory scheme.

The $250,000 cap on noneconomic damages in medical malpractice suits in section 13–64–302, 6A C.R.S. (1996 Supp.), must be applied per patient. The plain language of section 13–64–302 differs significantly from the language of the general damages statute, section 13–21–102.5, 6A C.R.S. (1987), and thus

**25.** The issue of Kaiser's subrogation rights may arise in the context of the medical expenses award to be paid by Dr. Guidot and CPMG. For the reasons set forth in footnote 24, *supra,* we decline to reach any conclusion as to the appropriateness of subrogation.

our reasoning in *General Electric Co. v. Niemet,* 866 P.2d 1361 (Colo.1994), does not apply to section 13–64–302.

Finally, the purpose of the contract exception in section 13–21–111.6, 6A C.R.S. (1987), is to ensure that a defendant does not receive a windfall by avoiding payment of damages because the plaintiff had the foresight to purchase insurance, or enter into a contract that compensates the plaintiff for injury caused by the defendant. When, however, the payor of the compensation pursuant to the contract is also liable for the plaintiff's judgment, the rationale for the contract exception disappears. In such a case, offset pursuant to section 13–21–111.6 is required.

We thus reverse the court of appeals opinion with respect to the medical expenses award and remand with directions to return the case to the trial court for modification consistent with this opinion, and otherwise affirm.

KIRSHBAUM, J., concurs and specially concurs, and LOHR, J., joins in the concurrence and special concurrence.

MULLARKEY, J., concurs in part and dissents in part.

Justice KIRSHBAUM concurring and specially concurring:

I join in the majority's opinion with the exception of that portion of Part II thereof applying our decision in *Miller v. Clark,* 144 Colo. 431, 432, 356 P.2d 965, 966 (1960), to

the circumstances of this case. Assuming, *arguendo,* that the broad dictum in *Miller* in fact establishes a unique exception to traditional principles of standing for purposes of participation in direct appeals of trial court judgments,[1] neither the decision nor the sentence is applicable to Kaiser's efforts to participate as a party in this certiorari proceeding. The majority in effect recognizes this distinction. Maj. op. at 1222 n. 10. I agree with the majority's conclusion that Kaiser's failure to file a petition for rehearing with the court of appeals precludes it from participating in this certiorari proceeding. Maj. op. at 1223; § 13–4–108(1), 6A C.R.S. (1987); C.A.R. 52(b); *see Farmers Group, Inc. v. Williams,* 805 P.2d 419, 428–29 (Colo.1991). Whatever its vitality, our dictum in *Miller* is in my view irrelevant to the circumstances here present.

LOHR, J., joins in this concurrence and special concurrence.

Justice MULLARKEY concurring in part and dissenting in part:

I agree with the majority's conclusion that Kaiser Foundation Health Plan of Colorado, Inc. (Kaiser) may not reenter the case for certiorari review purposes. I respectfully dissent, however, from the majority opinion holding that the parties are not required to arbitrate their dispute because the "Kaiser Agreement" executed between Kaiser and the decedent Michael Evans must comply with the arbitration conditions of section 13–64–403, 6A C.R.S. (1996 Supp.) of the Health

---

1. *See State Bd. for Community Colleges v. Olson,* 687 P.2d 429, 435 (Colo.1984); *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (Colo.1977). In *Miller,* we held that a guardian ad litem appointed by the probate court to represent " 'all persons under legal disability' " in an intestacy proceeding did not have standing to prosecute an appeal of the probate court's judgment. *Miller,* 144 Colo. at 432, 356 P.2d at 966. In so doing, a three-judge department of this court made the following observations:

One of two tests must be met before a party may prosecute a writ of error to this court. He must either be a party to the action or he must be a person substantially aggrieved by the disposition of the case in the lower court. As was stated in *Wilson v. Board of Regents,* 46 Colo. 100, 102 Pac. 1088:

"... Appeals are not allowed for the mere purpose of delay, or to present purely abstract

legal questions, however important or interesting, but to correct errors injuriously affecting the rights of some party to litigation. Only parties aggrieved may appeal. The word 'aggrieved' refers to a substantial grievance...."
*Id.* These comments are at best inconsistent with the quoted statement from *Wilson v. Board of Regents,* 46 Colo. 100, 100, 102 Pac. 1088, 1089 (1909), upon which they appear to have been based. In *Wilson* we referred only to aggrieved parties, not aggrieved persons. Furthermore, the two sentences in *Miller* are inconsistent. The first sentence states a test applicable only to a "party" who seeks to prosecute a writ of error. The second sentence commences with the pronoun "he," which can refer only to the precedent noun "party," but then refers to either a party or a person.

Care Availability Act (HCAA). By its own language, section 13–64–403 applies only to agreements between a patient and a "health care provider." The legislature did not include Health Maintenance Organizations (HMOs) in the definition of "health care provider," and there is no indication that the legislature intended the HCAA to apply to HMOs. On the contrary, the legislature enacted a separate statute concerning dispute resolution that is specific to HMOs and that statute should control this case. *See* Colorado Health Care Coverage Act (Coverage Act), Part 4, §§ 10–16–401 to –428, 4A C.R.S. (1994). Applying the rigid arbitration provisions of the HCAA to an HMO undermines the expressed intent of the Coverage Act. Moreover, the majority's holding is contrary to the state of Colorado's undeniable support of alternative dispute resolution, in general, and arbitration clauses, specifically. Because of my disposition of the arbitration issue, I would not reach the other two issues addressed by the majority.

## I.

The majority contends that since Kaiser is not a party to this proceeding, and since there are no surviving claims against Kaiser, it need not consider the issue of whether Kaiser itself is a health care provider. Maj. op. at 1226. By this, the majority appears to conclude that arguments concerning the inapplicability of the HCAA to HMOs are unpersuasive when the Providers, and not the HMO, are seeking the protection of the arbitration agreement. By this logic, any agreement between an enrollee and the HMO is irrelevant so long as the enrollee brings suit against the provider and not the HMO. This conclusion both misinterprets and seriously undervalues the legal relationship between an HMO and its contracting providers.

An HMO has special statutory status. It is not deemed to be practicing medicine and is exempt from the provisions of laws relating to the practice of medicine. § 10–16–421(3), 4A C.R.S. (1994). HMOs can only provide health care services by contracting with or employing health care providers. § 10–16–403(1)(c), 4A C.R.S. (1994). As an HMO, Kaiser contractually assumes the ad-

ministrative and financial burdens which otherwise would be borne by the Providers. In return, the Providers are responsible for rendering medical services to Kaiser's members. *See* Peter R. Kongstvedt, The Managed Health Care Handbook 17–21 (1993). Thus, the roles and responsibilities of an HMO and its health care providers are inextricably bound together and the applicability of the HCAA to the Providers cannot be determined without considering the applicability of the HCAA to an HMO.

At the outset, it must be recognized that the lawsuit now before us challenged the Kaiser Agreement only on the grounds that it did not comport with the technical requirements of the HCAA. There is no claim that the decedent did not understand the clause's provisions, that he entered into the agreement under duress, or that his survivors are not bound by the decedent's agreement to arbitrate disputes. Section eight of the Kaiser Agreement is reproduced in the majority opinion and clearly states that "[a]ny claim arising from alleged violation of a duty incident to this Agreement ... shall be submitted to binding arbitration...." Maj. op. at 1222, n. 8. Furthermore, the "Application for Membership Enrollment", which was signed by the decedent, clearly states that "any claim for money damages asserted by a member's heirs or personal representatives must be submitted to binding arbitration instead of a court trial." *Id.* By all accounts, other than failing to meet the requirements of the HCAA, this was a valid agreement between Kaiser and the decedent to submit claims to binding arbitration.

The public policy of the State of Colorado clearly encourages the resolution of disputes through arbitration. *Mountain Plains Constructors, Inc. v. Torrez,* 785 P.2d 928, 930 (Colo.1990); *Firelock v. District Court,* 776 P.2d 1090, 1099 (Colo.1989)("By expediting the adversary process, arbitration promotes quicker settlement of cases thereby speeding up access to the courts and decreasing the costs to the parties.") Even Colorado common law consistently recognized the benefits of arbitration. *Wales v. State Farm Mut. Auto. Ins. Co.,* 38 Colo.App. 360, 363, 559 P.2d 255, 257 (1976). In 1975, the Colorado

legislature endorsed the use of this form of dispute resolution by enacting the Uniform Arbitration Act. §§ 13–22–201 to –221, 6A C.R.S. (1987). In fact, one of the express purposes of the HCAA was to stem the tide of malpractice claims and to facilitate the use of arbitration as a means of controlling rising health care costs. § 13–64–102, 6A C.R.S. (1996 Supp.). In order to protect these goals, any statute that limits the right to contract for binding arbitration should be strictly construed.

The issue now before the court arises because of an apparent conflict between the Coverage Act and the HCAA. Part 4 of the Coverage Act was initially enacted in 1973 as the Colorado Health Maintenance Organization Act (HMO Act) at section 10–17–101, 4A C.R.S. (1987). The act was repealed and reenacted in 1992 as part of the Health Care Coverage Act. §§ 10–16–401 to –428, 4A C.R.S. (1994). Under the Coverage Act, Colorado HMOs operate subject to the general authority of the Commissioner of Insurance. § 10–16–401, 4A C.R.S. (1994). With respect to dispute resolution, the Coverage Act requires the HMO to adopt, and submit for approval to the Commissioner of Insurance, "reasonable procedures" for resolving enrollee complaints concerning health care services. § 10–16–409(1)(a), 4A C.R.S. (1994). The purpose of the complaint system required by section 10–16–409 is to facilitate resolution of complaints "concerning health care services." § 10–16–409(1)(a), 4A C.R.S. (1994). This provision allows HMOs the flexibility to fairly resolve disputes while still maintaining reasonable costs to their enrollees. Furthermore, by requiring that the plan be reviewed and approved by the Insurance Commissioner, the Coverage Act provides a level of protection not offered to patients who are treated by private practitioners or practice groups.

The more general HCAA was enacted in 1988 with the express purpose of protecting "the continued availability of adequate health care services ... by containing the significantly increasing costs of malpractice insur-ance for medical care institutions and licensed medical care professions." § 13–64–102, 6A C.R.S. (1996 Supp.). Among other things, the legislature intended the act to ensure "that an arbitration agreement be a voluntary agreement between a patient and a health care provider." § 13–64–403, 6A C.R.S. (1996 Supp.). Under the HCAA, in order for a health care provider and a patient to agree to binding arbitration, the agreement must strictly conform to the provisions of the section. § 13–64–403(2), 6A C.R.S. (1996 Supp.). The majority has sufficiently explained these requirements and I believe it is fair to describe them as detailed, if not rigid.

The conflict between these two statutes is clear. With respect to dispute resolution, which would include arbitration, the Coverage Act requires HMOs to develop "reasonable procedures" which have a "clear and understandable description." § 10–16–407(1)(d), 4A C.R.S. (1994). The HCAA, on the other hand, requires that an arbitration agreement include four paragraphs of specific language, most of which must be printed in ten-point, bold-faced type. § 13–64–403(4), 6A C.R.S. (1996 Supp.). The majority contends that the requirements of the two acts are not contradictory and that HMOs must comply with both.[1] Maj. op. at 1228. In essence, the majority's holding replaces the "reasonable procedures" and "clear and understandable description" required by the Coverage Act with the restrictive provisions of the HCAA.

The majority's conclusion that the arbitration provisions of the HCAA apply to HMOs is also contrary to the determination made by the Commissioner of Insurance. In 1992, four years after the HCAA was enacted, the Commissioner of Insurance promulgated a regulation concerning arbitration agreements which is reproduced in the majority opinion. Maj. op. at 1227. This regulation requires the HMO to fully disclose the terms and conditions of the binding arbitration requirement in the contract and in the evidence of coverage. Rule VIII(D)(5), 3 C.C.R. 702–4–

---

1. As I discuss in part II. *infra* of my opinion, the Providers make a strong argument that an HMO cannot comply with the HCAA. Regardless of whether such compliance is theoretically possible, there is no indication that the legislature intended the HCAA to apply to an HMO.

7–2 (1992).[2] The HMO must also advise the enrollee of his or her rights and duties under the agreement at the time of any complaint. *Id.* The Kaiser Agreement arbitration provision now before this court meets the Commissioner's requirements. As the administrative official charged with enforcement of the Coverage Act, the Commissioner's regulatory interpretation is entitled to appropriate deference. *Lucero v. Climax Molybdenum Co.,* 732 P.2d 642 (Colo.1987).

I find the Commissioner's interpretation persuasive because nothing in the HCAA expressly or by necessary implication addresses HMOs. The plain language of section 13–64–403(1) limits the application of its requirements to "health care providers." § 13–64–403(1), 6A C.R.S. (1996 Supp.). The statute defines a "health care provider" as

any person licensed or certified by the state of Colorado to deliver health care and any clinic, health dispensary, or health facility licensed by the state of Colorado. The term includes any professional corporation or other professional entity comprised of such health care providers as permitted by the laws of this state.

§ 13–64–403(12), 6A C.R.S. (1996 Supp.). As an HMO, Kaiser is a legislatively created entity with the power to provide services by contracting with or employing "health care providers." § 10–16–403(1), 4A C.R.S. (1994). Kaiser is not certified or licensed to deliver health care, nor is Kaiser a health dispensary or facility. Therefore, while an HMO may contract with and employ "health care providers," the HMO itself is not a "health care provider" under the statute's own definition.

The majority finds the HCAA applicable to an HMO only by ignoring the fact that Kaiser is not a "health care provider" as defined by that act. Consistent with the holding of the court of appeals, the majority infers from subsection (2) of 13–64–403, which refers to "any agreement for the provision of medical services," that the statute applies irrespective of the capacities of the parties to the agreement. In my view, this construction reads too much into the HCAA. This passing reference in subsection (2) of 13–64–403 is too slight and insignificant to be the basis for a major policy decision by the legislature requiring HMOs to comply with the HCAA.

In construing a statute, it is fundamental that the whole of the act be read and considered in context, and a consistent, harmonious and sensible effect must be given to all its parts. *Martinez v. Continental Enters.,* 730 P.2d 308, 315 (Colo.1986). In this case, the HCAA clearly states that the legislature's intent was to protect the voluntariness of an agreement between a "patient and a health care provider." § 13–64–403(1), 6A C.R.S. (1996 Supp.). Therefore, subsection (2)'s reference to "any agreement" should be construed as referring to any agreement between a patient and a health care provider.

Generally, a specific statutory provision prevails over a general provision "unless the general provision is later in time and the legislature has manifested a clear intent that the general provision should prevail." *Scholz v. Metropolitan Pathologists, P.C.,* 851 P.2d 901, 908 (Colo.1993). While certainly aware that HMOs use "health care providers" to supply medical services, the legislature failed to mention HMOs in section 13–64–403 of the HCAA when it was enacted in 1988. § 13–64–403, 6A C.R.S. (1996 Supp.). It also left unchanged the Coverage Act's requirements for "reasonable procedures" for dispute resolution when that statute was repealed as the HMO Act and re-enacted as part 4 of the Coverage Act in 1992. § 10–16–401 et seq., 4A C.R.S. (1994). In my opinion, if the legislature had intended this provision of the HCAA to apply to HMOs, it would have specifically included HMOs in the statute. Since the provisions of sections 10–16–407 and 10–16–409 of the Coverage Act are specific to HMOs and HMO contracts, they should control over the more general provisions of section 13–64–403 of the HCAA.

## II.

The Providers have argued that the requirements of section 13–64–403 of the

---

**2.** Although this 1992 regulation did not exist when the Evans' claim arose in 1990, it remains significant for the fact that it does not reference the requirements of § 13–64–403, 6A C.R.S. (1996 Supp.) of the HCAA. If the Commissioner expected HMOs to comply with the HCAA as well as the Coverage Act, such intent would have been stated in the arbitration regulations.

HCAA are administratively unworkable when applied to health care delivery by an HMO. According to the Providers, this provision of the HCAA contemplates that individual arbitration agreements are to be signed with a particular provider and specific medical services in mind.[3] Therefore, the Providers argue that the HCAA appears to require the enrollee to sign a new arbitration agreement every time he or she has a new illness, sees a new physician or nurse, is referred for a specialist consultation, or visits a different clinic. In response to these concerns, the majority states that "in concept" there is "no reason why a new agreement would be required for each specific medical service." Majority op. at 1228, n. 20. The majority concludes that "an initial agreement between Kaiser and an enrollee, with one rescission period, would appear to be sufficient for all subsequent medical services." *Id.* While this dicta interpreting the HCAA may serve to assuage some fears about the impact of the HCAA on an HMO's operating budget, the majority's analysis illustrates that the HCAA cannot be applied to an HMO without an aggressive construction of the act. This fact lends further support to the conclusion that the legislature did not intend the HCAA to cover HMOs.

### III.

This case presents a difficult question of statutory interpretation that can be, but has not been, expressly resolved by the legislature. In my view, the legislature's stated concerns with both protecting the flexibility of HMOs and supporting the use of arbitration to resolve disputes should lead this court to uphold the Kaiser Agreement. The majority's decision is not consistent with these important concerns and rests on a weak statutory inference as a declaration of legislative policy. I therefore respectfully concur in part and dissent in part.

---

**3.** *See* § 13–64–403(5), 6A C.R.S. (1996 Supp.)("Once signed, the agreement shall govern all subsequent provision of medical services for which the agreement was signed until or unless rescinded by written notice"); *see also* § 13–64–403(3), 6A C.R.S. (1996 Supp.)(requiring that written notice of the rescission be given "to the physician").