Susan LEVY, Plaintiff–Appellant
and Cross–Appellee,

v.

AMERICAN FAMILY MUTUAL INSUR-
ANCE COMPANY, Defendant–Ap-
pellee and Cross–Appellant.

No. 09CA2451.

Colorado Court of Appeals,
Div. V.

Feb. 3, 2011.

Rehearing Denied April 21, 2011.*

* Terry, J., would grant.

Gregory Chernushin, P.C., Gregory Chernushin, Colorado Springs, Colorado, for Plaintiff–Appellant and Cross–Appellee.

Jones, Waters & Geislinger, L.L.C., Anthony A. Johnson, Colorado Springs, Colorado, for Defendant–Appellee and Cross–Appellant.

Opinion by Judge GRAHAM.

Plaintiff insured, Susan Levy, appeals the district court's order declaring that American Family Mutual Insurance Company (American Family), the insurer of a vehicle in which she was a passenger, was entitled to deduct the amount of medical payments previously paid on her behalf from an arbitration award for damages under the insurance policy. American Family cross-appeals the district court's orders granting prejudgment interest and costs in favor of Levy. We affirm the order entitling American Family to deduct previously paid medical payments, reverse the orders granting prejudgment interest and costs in favor of Levy, and remand.

## I.  Background

In 2004, Levy was a passenger in a vehicle owned by Constance Gouge–Richardson. Gouge–Richardson had an insurance policy (policy) with American Family.  Levy was injured in an automobile accident caused by Jessica Fink, who was insured by USAA. Pursuant to the medical payment coverage of the insurance policy, American Family paid $18,838 to various medical providers for Levy's medical expenses.  The policy included a medical payment subrogation clause, which read:

> Our Recovery Rights.  If we pay under this policy, we are entitled to all the rights of recovery of the person to whom payment was made against another.  That

person must sign and deliver to us any legal papers relating to that recovery, do whatever else is necessary to help us exercise those rights and do nothing after loss to harm our rights.

When we pay damages under this policy to a person who also collects from another, the amount collected from the other shall be repaid to us to the extent of our payment.

Levy sought American Family's permission to settle with Ms. Fink and USAA. In response, American Family sent a letter that stated, "American family [sic] has waived its rights of subrogation against both USAA and their insured Jessica Sink [sic]." Levy received $23,763.77 from her settlement with Ms. Fink and USAA.

Levy also filed a complaint in the district court seeking money damages from American Family under the uninsured/underinsured motorist (UM/UIM) coverage of the policy. She exercised her right under the policy to seek binding arbitration.

The arbitration panel determined that Levy's damages totaled $77,500. The arbiters also found that Levy's medical expenses from the accident totaled $25,000, which was included in the $77,500 award. The arbitration panel later modified its award to include the following language:

At the commencement of the hearings in these matters, the parties agreed that, after award, they would modify and conform the award according to the terms of the insurance contract between the parties.

Both parties agree that the district court was the proper forum for modification and confirming the award. American Family filed a motion for declaration of applicable law and for confirmation of modified award in which it requested the district court to declare that it was entitled to reduce the arbitration award by the $18,838 it had paid for Levy's medical expenses. Levy opposed this reduction.

The district court concluded that American Family was entitled to reduce the arbitration award by the amount American Family had paid for Levy's medical expenses. It found that the subrogation clause in the policy gave American Family the right to recover the medical payments. Therefore, the court concluded Levy could not have recovered her past medical expenses from the tortfeasor and should not recover them under the policy's UM/UIM coverage. The court also concluded that the subrogation provision was not in violation of public policy pursuant to *DeHerrera v. American Family Mutual Insurance Co.*, 219 P.3d 346 (Colo.App.2009). The court further found that American Family did not waive its subrogation rights between it and Levy in the letter expediting Levy's settlement opportunities.

Thus, in the order of confirmation, the district court found that Levy was entitled to receive $77,500, less $23,763.77 (the amount received from the tortfeasor's insurance company), less $18,838 (the amount paid by American Family for medical payments), for a net payment of $34,898.23.

Meanwhile, Levy filed a motion for prejudgment and postjudgment interest on the arbitration award, as well as for costs. American Family opposed the motion. The district court concluded that Levy was entitled to prejudgment and postjudgment interest in the total amount of $16,421.44, as well as costs in the amount of $1,514.88.

Levy appeals the district court's order determining that American Family was entitled to reduce the arbitration award by the amount it had paid for her medical expenses. American Family cross-appeals the district court's orders granting prejudgment interest and costs in favor of Levy.

## II. Medical Payments

Levy contends the district court erred in concluding that American Family was entitled to reduce the arbitration award by the amount it previously paid for her medical expenses. We disagree.

A district court's legal conclusions regarding a motion to confirm or vacate an arbitration award are reviewed de novo. *Barrett v. Inv. Mgmt. Consultants, Ltd.*, 190 P.3d 800, 802 (Colo.App.2008).

We also review the interpretation of an insurance contract de novo. *DeHerr-*

*era,* 219 P.3d at 349. We give the words and phrases in an insurance contract their plain, everyday meaning, and construe them to carry out the intent of the parties. *Id.* at 349–50.

Initially, we assume that this issue is properly before us because both parties concede that they agreed to allow the district court to determine if the insurance policy entitled American Family to reduce the arbitration award by the amount of the medical payments made after the arbitration panel rendered its award. If the parties had not reserved this issue, the district court would not have had grounds to modify the arbitration award. *See Magenis v. Bruner,* 187 P.3d 1222, 1224 (Colo.App.2008) ("absent specific statutory grounds to vacate, modify, or correct an award, a court may not review the merits of the award"); *see also* § 13–22–224, C.R.S.2010 (setting forth specific grounds for modifying or correcting an arbitration award).

## A. Waiver

Both parties agree that American Family waived its rights to subrogation. Nonetheless, they disagree about the effect of this waiver. Levy argues that based upon its waiver American Family is not entitled to reduce the arbitration award by the amount it paid for her medical expenses. American Family responds that when it waived its subrogation rights, the waiver did not affect its right to avoid making duplicative medical payments to Levy, or, put another way, medical payments in addition to the reimbursed medical payments Levy recovered from Fink's insurer.

We agree with American Family that the waiver did not affect its right to avoid duplicative payments as set forth below.

## B. Collateral Source Rule

■ We first reject Levy's contention that the contract exception to the collateral source rule prevents American Family from reducing the arbitration award by the $18,838 it paid for her medical expenses.

Under the common law collateral source rule, "plaintiffs were allowed to recover the full damages awarded against defendants even though the plaintiffs also received compensation from collateral sources." *Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070, 1074 (Colo.1992). The rationale for the rule is that "[t]o the extent that either party received a windfall, it [is] considered more just that the benefit be realized by the plaintiff in the form of double recovery rather than by the tortfeasor in the form of reduced liability." *Id.* Payments from insurance policies have traditionally been considered a collateral source. *Yeiser v. Ferrellgas, Inc.,* 214 P.3d 458, 460 (Colo.App.2008) (*cert. granted* Aug. 31, 2009).

The General Assembly modified the collateral source rule by enacting section 13–21–111.6, C.R.S.2010. *See Volunteers of Am. v. Gardenswartz,* 242 P.3d 1080, 1084 (Colo. 2010). In contrast to the common law rule, the statute contains a "contract exception" that states:

> the verdict shall not be reduced by the amount by which such [injured] person, his estate, or his personal representative has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person.

§ 13–21–111.6.

Based upon this exception, Levy reasons that since her medical expenses could have been recovered against the tortfeasor, she should be able to recover them from American Family under the UM/UIM coverage.

This issue was addressed in *Quinones v. Pennsylvania General Insurance Co.,* 804 F.2d 1167 (10th Cir.1986). There, even in the absence of a collateral source limiting statute like Colorado's, the court refused to apply the collateral source rule because it would have resulted in a double payment of medical benefits by the insurer. In *Quinones,* the plaintiff, who had been injured by an uninsured motorist, filed suit against his own insurance company seeking damages under the insurance policy's UM provisions. *Id.* at 1169. The case was tried to a jury, which determined the plaintiff's damages. *Id.* at 1171. The federal district court for New Mexico refused to instruct the jury that the plaintiff's past medical expenses, which

had been reimbursed by the insurer under the medical payment provisions, were also recoverable under the UM provisions. *Id.*

The Tenth Circuit first noted that the insurer was both a defendant and a collateral source. *Id.* at 1171–72. It then noted the rule that when the collateral source is identified with the tortfeasor, the collateral source rule is inapplicable when suing the tortfeasor. *Id.* at 1171. Although the court acknowledged that this rule was not quite analogous to the case before it, since the insurer was not the actual tortfeasor, it stated:

> [W]e are not 'excusing' [the insurer] from liability when we forego the collateral source rule in this case; it has completely reimbursed [the plaintiff's] past medical expenses. Just as the [collateral source] rule's goal is not to reimburse plaintiffs twice, though oftentimes that is its effect, its goal is not to charge defendants twice, either.

*Id.* at 1172. Thus, no public policy was served by requiring the insurer to pay twice. *Id.* at 1171.

Nor should Levy be entitled to double recovery. This is not the traditional collateral source scenario where the plaintiff is entitled to double recovery—once from the tortfeasor and once from her insurer. Rather, we are persuaded by the rationale in *Quinones* that no public policy is served by permitting Levy double recovery of her medical payments. Neither the collateral source rule, nor the contract exception, dictates a contrary result. *See id.; see also Colorado Permanente Med. Group P.C. v. Evans*, 926 P.2d 1218, 1232 (Colo.1996) (contract exception did not apply to prevent medical expenses award from being offset by payments already made by health insurer).

■ Finally, we reject Levy's argument that once American Family waived its subrogation rights, no specific provision in the insurance policy authorized American Family to reduce the arbitration award by the medical payments it made. As in *Quinones*, Colorado law recognizes that the collateral source rule is inapplicable in situations where the plaintiff's compensation is attributable to the defendant or tortfeasor. *Van Waters & Rogers*, 840 P.2d at 1074. We conclude that the

present case is analogous and no specific policy language is required for American Family to avoid making duplicative payments. *See Quinones*, 804 F.2d at 1172 (no specific language in the insurance policy cited).

## C.  Anti–Subrogation Rule

■ We next reject Levy's argument that allowing American Family to reduce the arbitration award by the amount it paid for her medical expenses violates the anti-subrogation rule and renders the medical payment coverage illusory.

■ "Subrogation serves the purpose of limiting the possibility of a double recovery by the insured, and secures 'the ultimate discharge of the debt by the one who in equity and good conscience ought to pay it.' " *W. Cas. & Sur. Co. v. Bowling*, 39 Colo.App. 357, 359, 565 P.2d 970, 971 (1977) (quoting *DeCespedes v. Prudence Mut. Casualty Co.*, 193 So.2d 224, 227 (Fla.Dist.Ct.App.1966), *aff'd*, 202 So.2d 561 (Fla.1967)). The anti-subrogation rule prohibits an insurer from seeking recovery against its own insured on a claim arising from the risk for which the insured was covered. *Cont'l Divide Ins. Co. v. W. Skies Mgmt., Inc.*, 107 P.3d 1145, 1148 (Colo.App.2004). This rule serves two purposes: (1) it prevents the insurer from passing the loss back to its insured, an act that would avoid the coverage that the insured had purchased; and (2) it guards against conflicts of interest that might affect the insurer's incentive to provide a vigorous defense for its insured. *Id.*

Levy's argument is not aided by the anti-subrogation rule because it has no application to her circumstances. Her risk was covered and American Family is not seeking to lay off its own risk.

In *Continental Divide Insurance Co.*, an insurer provided a management company with liability coverage. 107 P.3d at 1148. Pursuant to the insurance policy, the insurer paid a large sum of money to a third party who claimed that the management company breached its contract with the third party. *Id.* at 1146. Because this type of liability was the very risk for which the management

company was insured, the anti-subrogation rule barred the insurance company from pursuing a subrogation claim against the management company. *Id.* at 1148–49.

In contrast, here the risk for which the insurance policy was purchased was covered and paid to Levy. In seeking to reduce the arbitration award by the amount it had already paid for Levy's medical payments, American Family does not pass a loss back to her, and its desire to avoid a double payment does not create a conflict of interest.

■ We also reject Levy's argument that allowing American Family to reduce the arbitration award by the amount of the medical payments renders the benefits of the medical payment coverage illusory.

In *DeHerrera,* a division of this court concluded that the same medical subrogation clause at issue in this case permitted American Family to seek reimbursement for medical payments from the insured's settlement with the tortfeasor and did not make the medical payment coverage illusory. 219 P.3d at 351. The division highlighted the following benefits of the medical payment coverage:

- Prompt payment of the insured's medical expenses.
- Payment of the insured's medical expenses, regardless of fault. *Id.* For example, if Levy had been at fault, she would not owe American Family the amount it had paid for her medical expenses and it would be barred from seeking reimbursement.

We agree with the *DeHerrera* division that these benefits are valuable and thus the coverage is not illusory. *Id.* at 352. Furthermore, as explained above, Levy's risk was covered and paid.

We also reject Levy's reliance on *Union Insurance Co. v. Houtz,* 883 P.2d 1057, 1065 (Colo.1994). In *Union Insurance Co.,* the court concluded that the insurer was entitled to aggregate the amount of damages from multiple insureds when calculating the benefits due under the UM/UIM coverage without rendering the coverage illusory. *Id.* at 1065. Similarly, we conclude that the insurance policy coverage is not rendered illusory

simply by crediting an insurer with payments it has made, even if such payments might reduce available UM/UIM coverage. Levy makes no argument as to how that case is otherwise relevant to our inquiry.

### D.  Reduction of UM/UIM Benefits

■ We next reject Levy's assertion that allowing American Family to deduct the medical payments it made would unlawfully diminish her available UM/UIM benefits. Levy cites several Colorado cases in which the court declined to allow setoff against UM/UIM benefits where doing so would undermine the goal of preventing inadequate compensation to injured parties. *See Barnett v. Am. Family Mut. Ins. Co.,* 843 P.2d 1302, 1310 (Colo.1993); *Kral v. Am. Hardware Mut. Ins. Co.,* 784 P.2d 759, 765 (Colo. 1989); *Newton v. Nationwide Mut. Fire Ins. Co.,* 197 Colo. 462, 468, 594 P.2d 1042, 1046 (1979).

*Newton* involved a declaratory judgment brought by the insurer, Nationwide, to determine the validity of a policy provision which allowed it to subtract from UM coverage it was required to pay, any amounts of personal injury protection (PIP) claims arising from the same collision. 197 Colo. at 464, 594 P.2d at 1042. Nationwide had paid $5865.05 to the insureds under the PIP coverage. *Id.* at 464, 594 P.2d at 1043. The parties then arbitrated the insured's UM coverage and the arbitrators determined the insureds were entitled to $15,250. *Id.* The arbitrators did not identify any sum to be allocated as PIP–type losses, such as actual medical expenses, as opposed to general damages such as pain, suffering, and disability. Nationwide then sought an offset of amounts paid under the PIP coverage. The court observed that PIP payments were payable without regard to fault. Noting that UM coverage is an umbrella coverage which covers all kinds of losses, some of which might be covered by PIP coverage, the court used this example: An insured with $15,000 UM coverage has a total $20,000 loss, of which $15,000 is for PIP–type expenses. He is paid $15,000 under the PIP coverage. If the insurer is allowed to deduct the $15,000 from the UM coverage, the insured gets nothing plus has

to bear an additional $5,000 of the loss, even though he bought and paid for UM coverage. *Id.* at 466, 594 P.2d at 1044. This setoff was deemed to be contrary to public policy and to the legislature's express purpose in passing the Motor Vehicle Financial Responsibility Act, "to [i]nduce and [e]ncourage all motorists to provide for their financial responsibility for the protection of others and to assure the widespread availability to the insuring public of insurance protection against the financial loss caused by negligent financially irresponsible motorists." *Id.* at 467, 594 P.2d at 1045 (quoting § 42–7–102, C.R.S.2010 (formerly codified at § 10–4–320)).

The court provided a second hypothetical to show how the purchase of UM coverage could be discouraged by a setoff provision. *Id.* n. 7. A pays a premium for UM coverage in the minimum amounts of $15,000 per person and $30,000 per accident. B rejects coverage and pays no premium. A and B are involved in an accident with an at-fault uninsured motorist. Each suffers $15,000 in covered PIP–type losses and each has $45,000 in general damages (pain and suffering). A and B will each recover $15,000 under the PIP portions of their policies. If a setoff were permitted, A would receive nothing from his UM coverage. B would also receive $15,000. Thus, B had a disincentive to purchase UM coverage. *Id.*

The court went on to make these observations:

> The broadly worded set-off provision here involved is especially unfair, for it allows an uninsured motorist award to be reduced by PIP amounts paid *even where there is no showing that double recovery would result without the set-off.*

> The proper method to preclude the possibility of recovery of PIP–type losses under both PIP and uninsured motorist coverages would be to eliminate PIP paid benefits from the uninsured motorist [c]laim, then allow recovery of the uninsured motorist benefits to the extent non-PIP benefits are proved, up to the policy limits. *This procedure would preclude actual double recovery of no-fault benefits while allowing the insured the full protection of the uninsured motorist coverage*

*for which he paid a premium.* Moreover, such a procedure would prevent the insurer from reducing uninsured motorist coverage below the statutory minimums.

*Id.* at 468, 594 P.2d at 1046 (emphasis added).

Next, in *Barnett,* the court addressed a policy clause that permitted the insurer to reduce its liability for UM/UIM coverage by the amount the insured received in Social Security disability income (SSDI) benefits. 843 P.2d at 1304. The court again expressed its concern "regarding the prospect of granting an insured windfall profits by allowing double recovery for the same loss." *Id.* at 1308. Nonetheless, the court concluded that the clause was void as against public policy because the SSDI and UM/UIM benefits "overlap[ped] to some extent but [were] not duplicative." *Id.* at 1309 (quoting *Newton,* 197 Colo. at 468, 594 P.2d at 1046). The benefits were not duplicative because the SSDI benefits were designed to compensate the insured for a loss of income, while the UM/UIM benefits were intended to compensate the insured for any loss arising from bodily injury or death. *Id.* Relying on the rationale in *Newton,* the court stated that insurers "may not absolve their liability under UM/UIM provisions by reducing the amount of UM/UIM coverage they contracted to provide by payments received for separate and distinct insurance benefits." *Id.* at 1307.

Finally, *Kral* involved a policy provision and agreement that reduced the insurer's liability for UIM coverage by the amount the insured recovered in a civil action against third parties. 784 P.2d at 761. Again relying on the rationale in *Newton,* the court found this provision unenforceable to the extent that the reduction in benefits impaired the insured's ability to achieve full compensation for the loss caused by an uninsured motorist. *Id.* at 766. Nevertheless, the court recognized that the General Assembly did not intend to allow double recovery for the same loss and concluded that the insurer could enforce its release-trust agreement to the extent that the payment of UIM benefits would "result in [the insured's] receiving sums in excess of her total loss." *Id.*

We draw the following principles from these cases: (1) setoff is not allowed where the benefits are impaired; and (2) setoff is allowed to prevent a double recovery.

*Newton* and *Barnett* are distinguishable from the current case. In those cases, the insurer sought to reduce the benefits to the insured. Here, the benefits were not reduced. Some of them were paid by USAA, Fink's insurer, while the rest were paid by American Family. American Family actually paid the medical providers $18,838 under its medical payment coverage and allowed the insured, Levy, to collect that amount from USAA. The practical effect of this was that USAA paid the medical payments. Levy then sued American Family to recover gross damages under her UM/UIM coverage (which gross damages the arbitrators earmarked by saying that they *included* the medical payments which had already been paid to Levy by USAA). American Family then asked for credit for the insurance benefits it had already paid to Levy in order to avoid a double recovery.

Nothing in *Newton* involved a payment to the insured by a collateral source because the tortfeasor, hypothetical or otherwise, in that case was not insured—as opposed to the situation we have here. Fink, the tortfeasor, was insured—just not insured enough. As a result, our collateral source statute—which Levy invokes as a reason no setoff should be allowed—is called into question.

In *Barnett*, where the insurer sought to set off SSDI payments, the court was careful to note that although there was some overlap in the types of benefits, the two benefits "are not duplicative." *Barnett*, 843 P.2d at 1309. Here, of course there are no SSDI benefits involved. Levy in effect argues that she should be provided with a double recovery and that it is not barred by the collateral source statute. We disagree.

We think the basic import of *Newton* and *Barnett* is that insureds should not be deprived of benefits for which they pay a premium, but they should not be given a double recovery. Where a double recovery is involved, by definition, an insured is not deprived of any benefit of coverage. Simply put, neither *Newton* nor *Barnett* involved a situation where there was the prospect of a double recovery. Finally, this case is also distinguishable from *Kral* because Levy was fully compensated for her losses and American Family should therefore not be required to pay her medical expenses twice.

### E. Remaining Contentions

We decline to address Levy's argument that section 10–4–635(3)(b), C.R.S.2010, ratified the existing public policy that UM/UIM benefits should not be reduced by the amount of medical payments. She neither raised this argument in her opening brief nor brought this argument in the district court. *See DeHerrera*, 219 P.3d at 352 (not considering argument raised for the first time in a reply brief); *Beauprez v. Avalos*, 42 P.3d 642, 649 (Colo.2002) (issue not presented to or raised for the district court will not be considered on appeal).

Finally, Levy also argues in her reply brief that section 10–4–609, C.R.S.2010, demonstrates a legislative policy of preventing an insurer from seeking subrogation against the insured for UM/UIM coverage. While she cited this statute in her opening brief for the general proposition that insurers are required to provide UIM coverage, she did not make this argument. We therefore decline to address it. *See DeHerrera*, 219 P.3d at 352.

### III. American Family's Cross–Appeal

On cross-appeal, American Family contends the district court impermissibly modified the arbitration award by adding prejudgment interest and costs in favor of Levy. We agree.

### A. Prejudgment Interest

Colorado encourages the settlement of disputes through arbitration. *See* Colo. Const. art. XVIII, § 3; §§ 13–22–201 to – 229, C.R.S.2010 (UAA); *Farmers Ins. Exch. v. Taylor*, 45 P.3d 759, 761 (Colo.App.2001). "Arbitration is a special statutory proceeding, and the [UAA] sets out in precise detail the rules which apply concerning confirmation of an arbitration award, and the methods by which a party may request the court to

vacate or modify such an award." *Kutch v. State Farm Mut. Auto. Ins. Co.,* 960 P.2d 93, 97 (Colo.1998) (quoting *State Farm Mut. Auto. Ins. Co. v. Cabs, Inc.,* 751 P.2d 61, 65 (Colo.1988)).

█ Under the UAA, a party can apply to the court to vacate, modify, or correct an arbitration award within ninety days of receiving notice of the award. *See* §§ 13–22–223, 13–22–224, C.R.S.2010.

> After a party to an arbitration proceeding receives notice of an award, the party may make a motion to the court for an order confirming the award at which time the court *shall* issue a confirming order unless the award is modified or corrected pursuant to section 13–22–220 or 13–22–224 or is vacated pursuant to section 13–22–223.

§ 13–22–222(1), C.R.S.2010 (emphasis added). "A court is limited on review to modify or correct an arbitration award only upon statutory grounds and may not review the merits of the arbitrator's decision." *Duncan v. Nat'l Home Ins. Co.,* 36 P.3d 191, 192 (Colo.App.2001).

█ After confirmation of an arbitration award by the district court, the award is tantamount to a judgment and is entitled to be given such status by the court which reviews it. *Container Tech. Corp. v. J. Gadsden Pty., Ltd.,* 781 P.2d 119, 121 (Colo. App.1989). "Parties who agree to submit matters to arbitration are presumed to have agreed that everything, both as to law and fact, necessary to render an ultimate decision, is included in the authority of the arbitrator." *Id.*

█ This court "lacks jurisdiction to review an arbitrator's award; it has jurisdiction to review only orders and judgments entered by statutorily specified courts." *Thomas v. Farmers Ins. Exch.,* 857 P.2d 532, 533 (Colo.App.1993). Our review of the district court's legal conclusions in confirming or vacating an arbitration award is de novo. *See Barrett,* 190 P.3d at 802.

Here, the arbitration award states:

> After considering all the evidence presented and the arguments of counsel the Arbiters unanimously agree that [Levy] should be entitled to judgment against [American Family] in the amount of $77,500.00 for *all damages* related to the motor vehicle accident of December 7, 2004.

(Emphasis added.) American Family then applied for, and the court granted, confirmation of the arbitration award. The order of confirmation states, in pertinent part, that "[t]he arbiters made a finding that the gross damages sustained by Ms. Levy were $77,500.00" and that "[the court therefore orders] that the amount of the award which is due to [Levy] is $77,500. [sic] less $23,763.77 (the amount received from the tortfeasor) less $18,838 (the amount paid by American Family for medical expenses) leaving an award of $34,898.23 which the Court hereby and herewith confirms." The order is silent as to the issue of prejudgment interest and nothing in the record before us indicates that the issue was reserved by the parties for determination by the district court at a later date. In fact, the complaint specifically includes a prayer for relief asking for prejudgment interest, and all matters in the complaint were submitted to the determination of the arbiters except the issue of previously paid medical benefits discussed above.

█ After confirmation of the arbitration award, the district court ordered American Family to pay Levy an additional $16,421.44 in prejudgment interest on the amount awarded by the arbitration panel. However, "[p]rejudgment interest in a personal injury case is an element of compensatory damages, 'awarded to compensate the plaintiff for the time value of the award eventually obtained against the tortfeasor.'" *Old Republic Ins. Co. v. Ross,* 180 P.3d 427, 437 (Colo.2008) (quoting *Allstate Ins. Co. v. Starke,* 797 P.2d 14, 19 (Colo.1990)).

█ Because the arbitration award was for all damages incurred by Levy, and under Colorado law prejudgment interest is an element of compensatory damages, the arbitration award is assumed to include prejudgment interest. *See Container Tech. Corp.,* 781 P.2d at 121. Therefore, the district court's subsequent order granting prejudgment interest in favor of Levy was an impermissible modification of the arbitration

award. *See Duncan,* 36 P.3d at 192–93 (the addition of prejudgment interest upon confirmation of the arbitration award was an impermissible modification of the award when plaintiff did not request prejudgment interest during the arbitration proceedings but only when confirming the arbitration award); *cf. Treadwell v. Vill. Homes of Colo., Inc.,* 222 P.3d 398, 403 (Colo.App.2009) (arbiter has authority to include prejudgment interest in award based upon parties' stipulation allowing arbiter to consider "statutory interest"); *Hamby v. Williams,* 196 N.C.App. 733, 676 S.E.2d 478, 480 (2009) (the addition of prejudgment interest was a permissible modification of an arbitration award where the plaintiff specifically requested the arbitration panel award prejudgment interest and the panel chose to defer calculation of prejudgment interest to the trial court).

Levy asserts that prejudgment interest on a UM/UIM claim is awardable based upon section 13–21–101, C.R.S.2010. However, Levy's reliance upon section 13–21–101 and *USAA v. Parker,* 200 P.3d 350 (Colo.2009), is misplaced. While prejudgment interest on a UM/UIM claim should be calculated at nine per cent per annum, *see Parker,* 200 P.3d at 358–59, the determination of whether prejudgment interest should be added to an award of damages in an arbitration is for the arbiters to decide. Absent a finding of prejudgment interest by the arbiters, or the reservation of the issue of prejudgment interest by the parties or the panel for the district court, it is impermissible for the district court to modify the arbitration award to add prejudgment interest. *See Duncan,* 36 P.3d at 192–93. Thus, we conclude the district court erred in awarding Levy prejudgment interest on the confirmed arbitration award.

## B. Costs

American Family also contends the district court incorrectly ordered it to pay an additional $1,514.88 in court costs to Levy. We agree.

Under the UAA, "[a]n arbitrator may award reasonable attorney fees and other reasonable expenses of arbitration if such an award is authorized by law in a civil action involving the same claim or by the agreement of the parties to the arbitration proceeding." § 13–22–221(1), C.R.S.2010. Additionally, "[a]n arbitrator's expenses and fees, together with other expenses, shall be paid as provided in the award." § 13–22–221(2), C.R.S.2010.

Here, the insurance policy at issue is silent regarding attorney fees and costs. The arbitration award provides that "[American Family] is ... assessed the fees of the Arbiters." The award is silent as to any additional attorney fees or "other reasonable expenses."

In her motion requesting prejudgment interest and costs, Levy argued that she was entitled to costs under sections 13–16–105 and –122, C.R.S.2010, and C.R.C.P. 54(d). In its order granting Levy costs, the district court concluded that "there is no remaining issue of costs to be addressed" and that "[American Family] is bound by the arbitration award with regard to cost." Then, in a subsequent order, the district court awarded Levy $1,514.88 for "[Levy's] cost, docket fees and expenses."

As stated above, "[a]rbitration is a special statutory proceeding, and the [UAA] sets out in precise detail the rules which apply." *Kutch,* 960 P.2d at 97. Under the UAA, "[a] court may award the reasonable costs of [a] motion [granting an order confirming, vacating without directing a rehearing, modifying, or correcting an award] and subsequent judicial proceedings." § 13–22–225(2), C.R.S. 2010. Also,

> [o]n the application of a prevailing party to a contested judicial proceeding under section 13–22–222, 13–22–223, or 13–22–224, the court may add reasonable attorney fees and other reasonable expenses of litigation incurred in a judicial proceeding after the award is made to a judgment confirming, vacating without directing a rehearing, modifying, or correcting an award.

§ 13–22–225(3).

■■■ Here, American Family, not Levy, petitioned the court to confirm the arbitration award. Therefore, Levy is not entitled to costs for this motion under section 13–22–225(2). Additionally, Levy is not the prevail-

ing party to a contested judicial proceeding under section 13–22–225(3), because assuming, without deciding, that the confirmation of the arbitration award was a contested proceeding, Levy did not prevail on the contested issue and, therefore, is not entitled to costs. Absent an arbiters' award in Levy's favor for costs, *see* § 13–22–221(1), the district court erred in granting costs in favor of Levy.

As American Family has paid the fees of the arbiters and was liable for no other costs to Levy, the trial court erred in granting Levy $1,514.88 in costs.

### C. Postjudgment Interest

■ We note that postjudgment interest on an arbitration award is proper, *see Barrett*, 190 P.3d at 805, and because the order of the district court granting Levy interest in the amount of $16,421.44 does not include separate amounts for prejudgment and postjudgment interest, we must remand to the district court for it to determine what portion of its interest award was for postjudgment interest.

The district court's order determining that American Family was entitled to reduce the arbitration award by the amount it had paid for Levy's medical payments is affirmed, and its orders awarding prejudgment interest and costs to Levy are reversed. The case is remanded for proceedings consistent with this opinion.

Judge ROMÁN concurs.

Judge TERRY concurs in part and dissents in part.

Judge TERRY concurring in part and dissenting in part.

I concur in the parts of the majority's opinion holding Levy was not entitled to recover prejudgment interest, and that she was entitled to recover postjudgment interest.

Because I believe the majority's holding, permitting the insurer to take a setoff against the insured's uninsured/underinsured (UM/UIM) coverage for payments it made under the medical payments coverage, is at odds with applicable Colorado Supreme Court precedents, I respectfully dissent from the remainder of the majority's opinion. *See Newton v. Nationwide Mutual Fire Insurance Co.*, 197 Colo. 462, 594 P.2d 1042 (1979); *Kral v. American Hardware Mutual Insurance Co.*, 784 P.2d 759 (Colo.1989); *Barnett v. American Family Mutual Insurance Co.*, 843 P.2d 1302 (Colo.1993).

The majority begins its analysis of the setoff issue by discussing *Quinones v. Pennsylvania General Insurance Co.*, 804 F.2d 1167 (10th Cir.1986). That case was not decided under Colorado law, and, in my view, is inconsistent with the *Newton–Kral–Barnett* trilogy.

*Quinones* was cited in *Colorado Permanente Medical Group, P.C. v. Evans*, 926 P.2d 1218 (Colo.1996). However, *Evans* did not overrule *Newton*, *Kral*, or *Barnett*, either explicitly or by implication. *Evans* did not decide the issue of whether a setoff is permitted under UM/UIM coverages, as those previous cases did, and as we do today. Because here such a setoff issue was squarely presented to the trial court and to us, we must address it in the manner directed by those precedents.

### I. *Newton, Kral,* and *Barnett*

I respectfully disagree with the majority's reading of the supreme court's holding in *Barnett*. Because that case relied on *Newton* and *Kral*, I begin my discussion with those earlier precedents.

In *Newton*, three persons were injured in a car accident with an uninsured driver. The injured parties, as occupants of a car owned by Newton, were all insured under the UM coverage of her insurance policy. A policy provision purported to give the insurer the right to reduce the amounts payable under UM coverage by any amounts that were payable to the insureds for any personal injury protection (PIP) benefits. The supreme court held that policy provision to be contrary to public policy, because it could have resulted in the insurer providing less than the statutorily mandated minimum UM coverage.

The *Newton* court explained that, while, "generally speaking, the 'No Fault' statute does not favor 'double recovery' of PIP benefits by the insured," there was no such prohibition against double recovery provided in the UM statute. 197 Colo. at 468, 594 P.2d at 1045. It stated, "[I]f the General Assembly in adopting the 'no fault' provisions and the [UM] coverage statute had intended to prevent a 'double recovery' by an automatic dollar-for-dollar [setoff] of PIP benefits against amounts payable under [UM] coverage, it would have been simple to expressly so provide." *Id.*

As a result of the supreme court's ruling in *Newton*, the insureds could have gotten a double recovery by receiving PIP payments that, at least in part, compensated them for medical expenses, as well as receiving UM coverage payments that would have compensated them for the same elements of damage.

*Kral* expanded on the holding of *Newton*. In *Kral*, the decedent was killed in a car accident with an uninsured motorist. His widow sought payment of benefits from the insurer under the decedent's UM coverage. A policy provision stated that if the insured recovered from any other party, the insured would be required to reimburse the insurer for any amount it had paid. The widow also signed a separate "release-trust" agreement to repay the insurer fifteen percent of any monies she received in her suit against the uninsured driver and others.

In *Kral*, the supreme court stated:

Enforcement of the subrogation clause and release-trust agreement would place Kral in the position of having no greater protection against her loss than if uninsured motorist coverage had not been purchased. This result would contravene the strong policy adopted by the General Assembly to enable an insured who purchases uninsured motorist protection to receive the benefits of that coverage to the extent necessary for full compensation for loss caused by the negligent conduct of a financially irresponsible motorist.

784 P.2d at 764. The court therefore found the policy provision to contravene public policy, and held it to be unenforceable.

However, the court also spoke to the possibility of double recovery by the widow:

[T]he General Assembly did not intend to grant windfall profits to insureds by authorizing them to obtain double recovery for the same loss. To the extent payment of all or part of the authorized uninsured motorist benefit to Kral would, when added to the settlement proceeds she received, result in her receiving sums in excess of her total loss, the insurer should be entitled to enforce the terms of *the release-trust agreement.*

*Id.* at 766 (emphasis added). Thus, according to the *Kral* court, a double recovery by the insured was to be avoided, if at all, only by enforcing the separate release-trust agreement, and not by allowing the setoff provided for in the insurance policy. That ruling has implications here, as well.

In *Barnett*, the supreme court further expanded the holdings of the previous two cases. Barnett made a claim against her UIM coverage for injuries she received in an accident with the tortfeasor. She had $100,000 in UM/UIM coverage. After suing the tortfeasor, she recovered a judgment and was paid the $50,000 limits of the tortfeasor's liability insurance policy. This $50,000 recovery was set off against the $100,000 UM/UIM limits of her own policy, and that setoff was not contested.

Barnett then tried to collect the remaining $50,000 in policy limits from her insurer. Her UM/UIM insurance policy allowed the insurer to take a setoff against UM/UIM coverage for payments the insured received under any disability benefits law. Because Barnett had received Social Security disability insurance (SSDI) benefits as a result of her injuries sustained in the accident, the insurer filed a declaratory judgment action, seeking a determination that it was entitled to the setoff provided for in the policy.

In rejecting the insurer's position, the supreme court expanded on its more limited holding in *Newton* "as a result of subsequent amendments to the uninsured motorist statute and this court's holding in *Kral,* 784 P.2d at 765." *Barnett,* 843 P.2d at 1307. No longer was the concern whether the insured's recovery might fall below statutorily mandat-

ed minimum coverages. *Id.* Instead, the court reasoned that there might be a disincentive for an insured to buy UM/UIM coverage if he or she might receive *less than the limit* of such coverage if a setoff were to be taken for benefits received from elsewhere. The court stated:

> The General Assembly's decision to require insurers to offer $100,000 in UM/UIM coverage, and our reaffirmation of this obligation in [*Allstate Insurance Co. v. Parfrey,* 830 P.2d 905 (Colo.1992)], are significant because they mandate that $100,000 in UM/UIM coverage shall be available to an insured who elects to pay the additional premium for such coverage. An individual who pays for increased coverage should receive the additional benefits which the insurer agreed to provide. There is no incentive for an individual to purchase $100,000 in UM/UIM coverage if the insurer is only obligated to pay $25,000 in benefits.

843 P.2d at 1308.

In my view, *Barnett,* when read together with *Kral* and *Newton,* cannot be reconciled with the majority's paramount concern of preventing a double recovery to the insured. Quite the opposite of showing concern that the insured might get a windfall if she were to receive both SSDI benefits and UM/UIM benefits, the supreme court in *Barnett* noted a concern that the *insurer* might get a windfall:

> [I]nsurers may not absolve their liability under UM/UIM provisions by reducing the amount of UM/UIM coverage they contracted to provide by payments received for separate and distinct insurance benefits. As in *Newton,* the ... set-off clause at issue here could eliminate entirely [the insurer's] liability under the UM/UIM coverage. Allowing [the insurer] to receive such a windfall at the expense of Barnett undermines the purpose of UM/UIM coverage.

*Id.* at 1307.

The court further stated:

> [The insurer] argues that, if Barnett's SSDI benefits are not set off, she will receive duplicative benefits. This court has expressed concern regarding the pros-

pect of granting an insured windfall profits by allowing double recovery for the same loss. *Alliance Mut. Casualty Co. v. Duerson,* 184 Colo. 117, 518 P.2d 1177 (1974); *Newton,* 197 Colo. 462, 594 P.2d 1042; *Kral,* 784 P.2d 759. In *Duerson,* we held that the uninsured motorist statute does not contemplate double recovery. *Duerson,* 518 P.2d at 1181. In *Newton,* however, we found that an overlap of benefits is distinguishable from double recovery. *Newton,* 197 Colo. at 465–66, 594 P.2d at 1043–44. In refusing to set off PIP benefits from the available uninsured motorist coverage, the *Newton* court found that, *although an overlap of benefits existed, double recovery would not result* because:

> [t]he minimum benefits required to be covered by PIP include medical expenses, rehabilitation and occupational training costs, lost wages, and, to some extent, loss of essential services that the injured person would have performed without being paid. In contrast, uninsured motorist coverage compensates for [any loss] arising from bodily injury or death up to the policy limits.

843 P.2d at 1308 (emphasis added) (quoting *Newton,* 197 Colo. at 465–66, 594 P.2d at 1043–44).

I understand the supreme court's distinction between an overlap in benefits and a double recovery to mean that it will not find a double recovery unless the insured would receive precisely the same benefits from the other benefits source as the insured would receive under UM/UIM coverage. Here, the benefits Levy received under the medical payments coverage were only one element of an array of damages available to her under the UIM coverage, so that, under *Newton* and *Barnett,* the two benefits must be viewed as overlapping, and not entirely duplicative.

As the majority notes, the benefits payable to Levy were not reduced because some were paid by the tortfeasor's insurer (USAA), while the rest were paid by Levy's insurer (American Family). According to the majority, "the practical effect of this is that [the tortfeasor's insurer] paid the medical payments." However, the same can be said of

the situation in *Barnett:* the practical effect there was that SSDI payments compensated her for her physical impairment, which was also an element of damages available to her under UIM coverage.

It is true that *Barnett* involved another benefit obtained under SSDI, and not from the same insurer that provided the UM/UIM coverage; thus the insured there did not face the prospect of a double recovery coming *from the same source.* But I do not perceive that would make any difference here, given that the supreme court had a similar holding in *Newton,* where both sets of benefits were payable by the same insurer under different coverages in the same policy. As I read *Newton,* it did pose the prospect of a double recovery coming from the same insurer.

While the majority relies on certain language from *Newton* discussing a method the insurer could use to eliminate the possibility of double payments to the insured, 197 Colo. at 468, 594 P.2d at 1046, *Barnett* demonstrated that when it comes to UM/UIM coverages, double recovery is tolerated in certain circumstances. Reading *Newton* together with *Kral* and *Barnett,* I conclude the supreme court would now hold that *Newton* is not limited to situations involving UM coverage; would apply its holding to UIM coverage; and would allow the insured here to retain the benefit she received under the medical payments coverage without any setoff against her recovery under the UM/UIM coverage. Consequently, in my view, the holdings of those three cases, and particularly that of *Barnett,* compel the conclusion that no setoff can be permitted here.

## II. *Evans*

The majority indicates that the collateral source rule is the primary concern here. The supreme court in the *Newton–Kral–Barnett* trilogy did not address the collateral source rule. Because the court did address that rule in *Evans,* I must try to reconcile that case with the trilogy.

I conclude that, because *Evans* did not involve UM/UIM coverages (which are subject to Colorado statutory provisions), and did not address the holdings of *Newton, Kral,* or *Barnett* in any way, it does not

control the analysis of the setoff issue presented here.

*Evans's* citation to *Quinones* is troubling, considering that *Quinones,* which dealt with UM coverage, reaches the opposite result as would have been reached under our supreme court's trilogy. *See Quinones,* 804 F.2d at 1171–72. *Quinones* did not involve Colorado law and did not discuss the holdings of *Newton, Kral,* or *Barnett. Evans* cites *Quinones* only as support for its conclusion that the collateral source statute allowed the insurer (Kaiser) to take a partial setoff from benefits payable to its insured. *Evans,* 926 P.2d at 1230–32.

The only issue in *Evans* that is in any way pertinent to the present case is its holding concerning the contract exception to the collateral source statute. Even that holding, however, is readily distinguished from the present case.

In *Evans,* the decedent was an insured of Kaiser's, but also was treated by Kaiser doctors and nurse-employees. The decedent's widow sued the doctors and nurse-employees for medical malpractice, and won. She was awarded $46,000 for decedent's medical expenses. Of that amount, Kaiser, as his medical insurer, had already paid $40,000. The trial court set off the $40,000 medical benefit against the $46,000 malpractice damages award, and that ruling was challenged on appeal.

*Evans* presented an unusual situation where Kaiser, the party financially responsible for damages awarded against some of the tortfeasors (the nurse-employees), was also the decedent's insurer. The supreme court distinguished the *Evans* case from the usual case involving the contract exception to the collateral source rule, where the tortfeasor would get a windfall if the injured party's insurer paid for that party's damages, and then the tortfeasor would be relieved from having to pay those same damages. Instead, in *Evans,* because the party liable for the judgment against some of the tortfeasors (Kaiser) *was also* the insurer, allowing a setoff for its payments to the widow would not give it a windfall, because it had already paid the damages. 926 P.2d at 1230–32.

We do not have a situation here like the one in *Evans*, where the tortfeasor and the insurer are related in some way.

It is notable here that the supreme court held that Kaiser was not entitled to a setoff for the *entire* $40,000 medical payments benefit, but only for the portion of that amount that Kaiser was found liable to pay on behalf of the nurse-employees for whom it was vicariously liable (thirty-five percent). The supreme court did not permit a setoff against the portion of the medical expenses award that was attributable to the non-employee doctors who treated the decedent (and for whom Kaiser was not vicariously liable), because the award against the doctors fell within the contract exception of the collateral source statute. 926 P.2d at 1231–32.

### III. Conclusion

In summary, I conclude that American Family was not permitted to take a setoff against the UIM benefits it paid to Levy. Consequently, I would reverse the order that allowed American Family to deduct previously paid medical payments from the arbitration award.